Order of 11/8/02 vacated and rehearing en banc denied by order filed 11/15/02. Opinion filed 9/19/02 is reinstated.

Rehearing en banc granted
by order filed 11/8/02; opinion
filed 9/19/02 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GREENVILLE WOMEN'S CLINIC;
WILLIAM LYNN, MD, on behalf of
themselves and their patients
seeking abortions,
    *Plaintiffs-Appellants,*

    and

CHARLESTON WOMEN'S MEDICAL
CLINIC, INCORPORATED,
    *Plaintiff,*                    No. 01-2090

    v.

COMMISSIONER, SOUTH CAROLINA
DEPARTMENT OF HEALTH AND
ENVIRONMENTAL CONTROL;
GOVERNOR OF SOUTH CAROLINA;
CHARLES MOLONY CONDON, in his
official capacity as Attorney
General of the State of South
Carolina,
    *Defendants-Appellees.*

GREENVILLE WOMEN'S CLINIC;
WILLIAM LYNN, MD, on behalf of
themselves and their patients
seeking abortions,
  *Plaintiffs-Appellees,*

  and

CHARLESTON WOMEN'S MEDICAL
CLINIC, INCORPORATED,
  *Plaintiff,*                                    No. 01-2235

  v.

COMMISSIONER, SOUTH CAROLINA
DEPARTMENT OF HEALTH AND
ENVIRONMENTAL CONTROL;
GOVERNOR OF SOUTH CAROLINA;
CHARLES MOLONY CONDON, in his
official capacity as Attorney
General of the State of South
Carolina,
  *Defendants-Appellants.*

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CA-96-1898-6-20)

Argued: April 5, 2002

Decided: September 19, 2002

Before NIEMEYER and KING, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

2

Affirmed in part and reversed in part by published opinion. Judge Niemeyer wrote the opinion, in which Senior Judge Michael joined. Judge King wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Bonnie Scott Jones, THE CENTER FOR REPRODUC-TIVE LAW & POLICY, New York, New York, for Appellants. Boyd Benjamin Nicholson, Jr., HAYNSWORTH, SINKLER, BOYD, P.A., Greenville, South Carolina, for Appellees. **ON BRIEF:** Randall Scott Hiller, Greenville, South Carolina, for Appellants. George Dewey Oxner, Jr., Floyd Matlock Elliott, HAYNSWORTH, SINKLER, BOYD, P.A., Greenville, South Carolina; Charles Molony Condon, James Emory Smith, Jr., OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina; Nancy Staats Layman, DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Columbia, South Carolina, for Appellees.

---

## OPINION

NIEMEYER, Circuit Judge:

This appeal continues our review of the facial constitutional challenges made by abortion clinics in South Carolina to Regulation 61-12 of the South Carolina Department of Health and Environmental Control, establishing standards for licensing abortion clinics. In *Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000), *cert. denied*, 531 U.S. 1191 (2001) ("*Bryant I*"), we held (1) that Regulation 61-12 did not place an undue burden on a woman's decision whether to seek an abortion in violation of the liberty interest protected by the Due Process Clause and (2) that the regulation did not distinguish unreasonably between clinics that performed a specified number of abortions and those that did not in violation of the Equal Protection Clause.

On remand, the district court addressed the remaining challenges made to Regulation 61-12, rejecting the abortion clinics' contentions

3

that the regulation unconstitutionally delegates licensing authority to nongovernmental third parties without standards; that it violates the Establishment Clause of the First Amendment; and that it is void for vagueness. The district court did, however, conclude that § 102(F) of the regulation, which provides South Carolina inspectors access to records of abortion clinic patients, infringes on a constitutional right to informational privacy insofar as it authorizes the disclosure of patients' names to State inspectors.

On the cross-appeals of the parties, we reject all of the remaining constitutional challenges to Regulation 61-12 and accordingly affirm in part and reverse in part.

I

As authorized in §§ 44-41-10 *et seq.* and 44-7-110 *et seq.* of the Code of Laws of South Carolina, the South Carolina Department of Health and Environmental Control ("DHEC") promulgated Regulation 61-12, entitled "Standards for Licensing Abortion Clinics." Because Regulation 61-12, which comprehensively regulates abortion clinics in South Carolina, was summarized more fully in *Bryant I*, 222 F.3d at 160-62, we only briefly summarize its ten chapters here:

Chapter 1, entitled "Definitions and Requirements for Licensure," includes definitions of relevant terms and sets forth the general requirement that abortion clinics in South Carolina be licensed and subject to inspections. A regulated abortion clinic is defined as "[a]ny facility, other than a hospital as defined in Section 101.J, in which any second trimester or five or more first trimester abortions per month are performed." DHEC Reg. 61-12, § 101(B). Any facility in violation of the regulation may be subjected to civil penalties, including suspension or revocation of its license or a monetary fine. *Id.* § 103.

Chapter 2, entitled "Administration and Management," describes operational policies and procedures, as well as personnel requirements. It also includes a summary of the patients' rights. *Id.* § 209.

Chapter 3, entitled "Patient Care," prescribes minimum procedures required in the treatment of all patients and a limitation of the proce-

dures that may be provided at the facility. The chapter includes admissions criteria, staff responsibilities, and details regarding abortion procedure and follow-up care. *Id.* § 301. Also included within this chapter are certain facility requirements, such as pharmaceutical capabilities and laboratories. *Id.* §§ 303, 304. There is a specification of minimum equipment and supplies, *id.* § 306, and a requirement that clinics implement an ongoing plan for improvement of patient care, *id.* § 308. The chapter further specifies that for purposes of emergency care, staff or consulting physicians shall have admitting privileges at a local hospital that has appropriate obstetrical and gynecological services. *Id.* § 305. Finally, the chapter requires that abortion clinics make arrangements for consultation or referral services "in the specialties of obstetrics/gynecology, anesthesiology, surgery, psychiatry, psychology, clinical pathology and pathology, clergy, and social services, as well as any other indicated field, to be available as needed." *Id.* § 307.

Chapter 4, entitled "Medical Records and Reports," sets forth detailed requirements for the generation of patient records, which must be maintained and stored in a "safe location" for at least ten years. *Id.* §§ 401, 402. This chapter also requires abortion clinics to report to the appropriate State agency each abortion performed, each "fetal death" when the fetus has developed beyond a certain stage, and each "accident or incident occurring in the facility which involves patients, staff, or visitors." *Id.* § 403.

Chapter 5, entitled "Functional Safety and Maintenance," deals with safety in clinics' handling of hazardous materials, needles, syringes, and similar materials. *Id.* § 501. It also requires the maintenance of emergency equipment and a plan for disaster preparedness. *Id.* §§ 502, 503.

Chapter 6, entitled "Infection Control and Sanitation," describes procedures for maintaining sterilized supplies and equipment, as well as requirements for having clean linen and towels, clean facilities and grounds, and waste disposal.

Chapter 7, entitled "Fire Protection and Prevention," details specific requirements for fire protection and safety, including mandatory fire drills and alarm testing.

Chapter 8, entitled "Design and Construction," sets forth requirements for approval of the design and construction of abortion clinics and includes requirements for specific types of rooms, security, and equipment.

Chapter 9, entitled "Prerequisites for Initial Licensure," includes the requirements for plan and construction approval, the existence of documentation demonstrating licensure, and the necessary facility permits.

Finally, Chapter 10, entitled "General," states in its entirety, "Conditions arising that have not been addressed in these regulations shall be managed in accordance with the best practices as interpreted by the Department."

On June 27, 1996, one day before Regulation 61-12 was to become effective, the plaintiffs — two abortion clinics and a doctor operating abortion clinics — commenced this action on behalf of themselves and their patients to obtain a declaratory judgment that Regulation 61-12 was facially unconstitutional on numerous grounds. The district court agreed with the plaintiffs in part, finding that Regulation 61-12 placed an undue burden on a woman's Fourteenth Amendment due process right to choose whether to seek an abortion and that the regulation violated the Equal Protection Clause of the Fourteenth Amendment by treating abortion clinics differently than other healthcare facilities without a rational basis for doing so. *Greenville Women's Clinic v. Bryant*, 66 F. Supp. 2d 691 (D.S.C. 1999). Because the district court struck down the regulation on two different grounds, it did not decide the plaintiffs' other constitutional challenges.

On appeal, we reversed, holding that Regulation 61-12 did not impose an undue burden on a woman's right to choose whether to seek an abortion and that South Carolina had a rational basis for treating abortion clinics differently from other medical facilities. *Bryant I*, 222 F.3d at 171-72, 174. We found that Regulation 61-12 serves a valid purpose in safeguarding the health of women and does not aim directly at a woman's right to make the decision to have an abortion. The $23-$75 increased cost per abortion attributable to compliance with Regulation 61-12 was, we held, an incidental effect that, while making abortions modestly more expensive, did not unduly burden a

woman's right to make the abortion decision. *Id.* at 169-72. Because the regulation did not strike at the abortion-decision right itself, we also applied a rational-basis standard to the equal protection analysis and concluded that South Carolina had a rational basis for regulating abortion clinics while not regulating other healthcare facilities. We noted that abortions are "inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Id.* at 174 (quoting *Harris v. McRae*, 448 U.S. 297, 325 (1980) (emphasis omitted)). At bottom, we concluded that "[a] woman in South Carolina who has determined to abort the life of a fetus can do so without significant interference from South Carolina's regulations and be assured thereby of a dignified and safe procedure." *Id.* at 175.

After the Supreme Court denied the plaintiffs' petition for a writ of certiorari, *see* 531 U.S. 1191 (2001), we remanded the case to the district court to address the plaintiffs' other constitutional challenges.

On remand, the district court rejected all but one of the plaintiffs' other constitutional challenges, concluding that Regulation 61-12 did not improperly delegate veto power to third parties; that it did not violate the Establishment Clause of the First Amendment; and that it was not unconstitutionally vague. The Court did, however, find that § 102(F)(2) violated patients' right to privacy insofar as it authorized State inspectors access to patients' records in which the patients were identified. Greenville Women's Clinic and William Lynn, M.D. (hereafter, "the abortion clinics") appealed the district court's rulings upholding the constitutionality of Regulation 61-12, and South Carolina cross-appealed the district court's ruling finding § 102(F)(2) in violation of patients' privacy rights.

II

The abortion clinics contend first that Regulation 61-12 provides for the standardless delegation of licensing authority to third persons, in violation of the Due Process Clause. They assert that the regulation makes licensing "contingent upon the cooperation of hospitals, clergy and other third parties, upon whose decisions the regulation imposes no standard or limitation." To support this argument, they rely on *Yick*

7

*Wo v. Hopkins*, 118 U.S. 356, 370 (1886), and *Hornsby v. Allen*, 326 F.2d 605, 608 (5th Cir. 1964).

Although Regulation 61-12 does not directly grant any veto power to third persons over the issuance of a license, it does require, as a condition of licensure, that clinic doctors maintain certain admitting rights with local hospitals and referral arrangements with other relevant experts. Specifically, Regulation 61-12 requires (1) that each abortion clinic have an agreement with a physician board-certified in obstetrics and gynecology who has admitting privileges at a local hospital to be available during "operating-hours," DHEC Reg. 61-12, § 205(c)(2); (2) that a physician at the clinic have admitting privileges at a local hospital with "obstetrical/gynecological services," *id.* § 305(A); *see also id.* § 309(B); and (3) that each abortion clinic make arrangements for referral services "in the specialties of obstetrics/gynecology, anesthesiology, surgery, psychiatry, psychology, clinical pathology and pathology, clergy, and social services, as well as any other indicated field, to be available as needed," *id.* § 307.

South Carolina argues that these admitting privileges and referral arrangements are necessary for the health and safety of patients. Moreover, it points out that these requirements are consistent with existing standards of the American College of Obstetricians and Gynecologists, as stated in its "Standards for Obstetric-Gynecologic Services" (7th ed. 1995), and of the National Abortion Federation, as stated in its "Standards for Abortion Care" (1988). It also denies that the regulation gives any of the third party specialists a veto power over licensure of abortion clinics and notes that, in practice, the abortion clinics' fears about being denied a license or losing their license because of any inability to establish such arrangements are not supported by the record. Indeed, both Greenville Women's Clinic and Dr. Lynn, the appellants in this case, are already licensed in South Carolina to perform abortions, and both have admitting privileges or arrangements with physicians who have admitting privileges at local hospitals with obstetrical and gynecological services. This evidence, South Carolina argues, is "fatal" to the abortion clinics' position.

We begin by emphasizing, as we did in *Bryant I*, that the challenge to Regulation 61-12 is a facial one and therefore "the most difficult challenge to mount successfully, since the challenger must establish

8

that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To show the necessary respect to legislative departments, particularly in light of Article III's limitation of judicial power to cases and controversies, we require evidence — as opposed to speculation — sufficient to rebut the regulation's presumptive constitutionality. Yet, in this record, we find only speculation.

There is nothing in the record or, indeed, in the general experience in South Carolina that suggests that the requirements to have admitting arrangements with local hospitals and referral arrangements with local experts in various related fields present a substantial impediment to obtaining or retaining a license. To the contrary, the appellants in this case have obtained licenses and have made such arrangements. The abortion clinics' asserted fears are further undermined by South Carolina's requirement that public hospitals not act unreasonably, arbitrarily, capriciously, or discriminatorily in granting or denying admitting privileges. *See, e.g.*, *In re Zaman*, 329 S.E.2d 436, 437 (S.C. 1985); *cf. Huellmantel v. Greenville Hosp. Sys.*, 402 S.E.2d 489, 491 (S.C. Ct. App. 1991) (stating that a physician's interest in being reappointed to a public hospital staff is protected by procedural and substantive due process requirements of the Fourteenth Amendment). The required referral arrangements present even lower practical barriers. Indeed, they are required to be made only "as needed." *See* DHEC Reg. 61-12, § 307.

These requirements of having admitting privileges at local hospitals and referral arrangements with local experts are so obviously beneficial to patients, *see, e.g.*, *Women's Health Ctr. of West County, Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989), and the possibility that the requirements will amount to a third-party veto power is so remote that, on a facial challenge, we cannot conclude that the statute denies the abortion clinics due process. *See Whalen v. Roe*, 429 U.S. 589, 601-02 (1977) (noting that, on a facial challenge of a statute, a "remote possibility" is "not a sufficient reason for invalidating" a statute); *see also Webster*, 871 F.2d at 1382 (rejecting due process challenge to a statute requiring physicians performing abortions to have surgical privileges at a hospital). This conclusion is further reinforced by the right given by Regulation 61-12, § 102(L), for clinics to seek a waiver or exception.

9

Accordingly, we reject the abortion clinics' due process challenge to Regulation 61-12 based on the regulation's requirement that abortion clinics have admitting privileges to local hospitals and referral arrangements with relevant experts.

III

The abortion clinics also contend that § 307 of Regulation 61-12 is a State-sponsored "law respecting an establishment of religion," as prohibited by the First and Fourteenth Amendments. Section 307 provides in relevant part:

> Arrangements shall be made for consultation or referral services in the specialties of . . . clergy . . ., to be available as needed.

The abortion clinics contend that this section requires that the clinics "establish formal, ongoing relationships with clergy persons who will be available to provide counseling services to their patients upon referral." And they argue that "[u]nder the provision, [the abortion clinics] must assess their patients' need for religious counseling and make referrals to such counseling as part of their practice of medicine. To enforce the regulation, DHEC must assess the adequacy of [the abortion clinics'] criteria and mechanisms for making such referrals." Relying on this reading of § 307, the abortion clinics maintain that the regulation violates the Establishment Clause of the First Amendment because (1) it coerces participation in religion; (2) it improperly entangles the State in religion; and (3) it creates "a symbolic union between church and state."

We conclude, however, that the abortion clinics' argument is grounded on a substantial misreading of § 307, imputing obligations and relationships that are not prescribed by the regulation. Section 307 does not require abortion clinics to become involved in religion, or to counsel their patients in religion, or to make any religious judgments. Rather, they are required only to have "arrangements" for referring patients to clergy "as needed." These arrangements might amount to no more than a list of clergy and other specialists or a readily accessible telephone book to consult as required by the needs of a particular patient. Since the need for a referral cannot be known

10

until the patient requests a referral, the "arrangement" cannot be made until then. And even then it need not involve more than a communication to a clergy member expressing the patient's request and perhaps setting up a consultation time.

The requirements of § 307 simply cannot be construed to "force physicians to participate in religion," or to "assess patients' needs for religious counseling," or to "force physicians to support religion" — as the abortion clinics in this case argue. Moreover, the language of the regulation does not support the abortion clinics' contention that the DHEC may evaluate whether abortion clinics have established an adequate system, adequate number, or adequate variety of clergy to whom referrals might be made. Finally, § 307 does not grant the religious community any veto power over the clinic's licensing application "thus creating a symbolic union between church and state." Because the section calls for arrangements "as needed," a clinic need not assist the patient by making a referral to clergy unless the patient so requests.

Rather than establishing religion, this section would appear at most to require a clinic to accommodate the requests of patients to exercise religion, a right also protected by the First Amendment. *See* U.S. Const. amend. I (forbidding any law that "prohibits the free exercise" of religion). Particularly because of the gravity of a woman's right to make the abortion decision, the regulation recognizes the patient's potential desire to consult clergy in making that decision. As the Supreme Court observed in *Planned Parenthood of S.E. Penn. v. Casey*, "the abortion decision . . . is more than a philosophic exercise. Abortion is a unique act [that is] fraught with consequences." 505 U.S. 833, 852 (1992). And similarly, we observed in *Bryant I*:

> As humankind is the most gifted of living creatures and the mystery of human procreation remains one of life's most awesome events, so it follows that the deliberate interference with the process of human birth provokes unanswerable questions, unpredictable emotions, and unintended social and, often, personal consequences beyond simply the medical ones.

222 F.3d at 175.

11

Accordingly, we conclude that the requirement imposed by § 307 on abortion clinics to make arrangements for referral services to clergy, as needed, does not, on its face, establish religion in violation of the First Amendment. *Cf. Brown v. Gilmore*, 258 F.3d 265 (4th Cir. 2001) (holding that a State statute requiring a moment of silence to enable students to meditate, *pray*, or engage in any other silent activity does not establish religion in violation of the First Amendment), *cert. denied*, 122 S. Ct. 465 (2001). In so concluding, we note that this facial challenge cannot encompass every way in which the DHEC might require a clinic to comply with § 307. Specific instances of enforcement may, of course, still be challenged on a case-by-case basis as they occur.

## IV

Finally, the abortion clinics contend that Regulation 61-12 is void for vagueness, in violation of the Due Process Clause. They contend that the regulation contains a number of requirements that employ "open-ended" terms lacking any fixed meaning, such as "best practice" or "case-by-case" basis. They maintain that the regulation uses ambiguous adjectives, such as "intensive job-related training," which qualifies a non-physician for work at a clinic. They assert that the regulation contains misnomers, giving as an example that the facilities must be kept "neat, clean and free from odors" and noting that because every medical office has odors, the regulation cannot mean what it says. Finally, they point to inherently ambiguous requirements such as the requirement that "all staff *and/or* consulting physicians shall have admitting privileges at one or more local hospitals." The abortion clinics have identified the following list of provisions that they challenge, and they suggest that this list is not exhaustive:

> 1. Section 102(J), which prohibits using an abortion facility name that is similar to the name of another such facility, but does not define how "similarity" will be determined.

> 2. Section 102(L), which allows DHEC to make exceptions to Regulation 61-12 "where it is determined that the health and welfare of the community require the services of the facility."

12

3. Section 103(F), which gives DHEC discretion with respect to a particular violation to impose any penalty within the range of possible penalties.

4. Section 201(B), which requires abortion providers to create, and DHEC to assess, policies and procedures on such matters as "patient rights" and "functional safety."

5. Section 204, which requires that staff be "adequately trained and capable of providing appropriate service and supervision to the patients."

6. Section 204(A), which requires that a provider "verify" an employee's "health and personal background."

7. Section 204(D), which prohibits employees and volunteers with "any . . . contagious disease or illness [from working] in any capacity in which there is a likelihood of such person transmitting disease to other individuals."

8. Section 205(C)(1), which requires physicians performing abortions to be "properly qualified by training and experience to perform pregnancy termination procedures."

9. Section 301, which requires the creation of various policies and procedures "designed to ensure professional and safe care for patients."

10. Section 305(A), which requires that "all staff and/or consulting physicians shall have admitting privileges at one or more local hospitals."

11. Section 306, which requires that "appropriate equipment and supplies" be maintained, with no specific requirements.

12. Section 307, which requires among the required consultation services, "any other indicated field, to be available as needed."

13. Sections 308(A) and (C), which require abortion facilities to establish a quality improvement plan that involves "criteria-based" evaluation of patient care.

14. Section 501(A), which requires abortion facilities to promulgate a range of policies and procedures "to enhance safety."

15. Section 602(A), which requires adequate space for sterile supplies and equipment.

16. Section 604, which requires that the facilities "be kept neat, clean and free from odors."

17. Section 606, which requires that "all outside areas . . . shall be kept free of . . . grass . . . that may serve . . . as a haven for insects."

18. Section 807, which requires that an "adequate number of examination/procedure rooms" and an "adequate number of recovery rooms" be provided.

19. Chapter 10, which states in its entirety, that "[c]onditions arising that have not been addressed in these regulations shall be managed in accordance with the best practices as interpreted by the Department."

In sum, the abortion clinics complain that Regulation 61-12 does not provide sufficient specifics to explain what conduct is actually mandated or prohibited.

The district court reviewed the abortion clinics' "litany of phrases which [were] allegedly unconstitutionally vague," and after considering the phrases in their context and taking Regulation 61-12 as a whole, the court concluded that "people of ordinary intelligence

14

would be able to understand what the regulation requires." The court also stated that the regulation "does not encourage arbitrary and discriminatory enforcement. In fact, it appears that the majority of Regulation 61-12 is identical to the American College of Obstetricians and Gynecologists ("ACOG") standards for obstetricians and gynecologists."

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). But because we are "condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). As such, a regulation is not void for vagueness unless it is so unclear with regard to what conduct is prohibited that it "may trap the innocent by not providing fair warning," or it is so standardless that it enables "arbitrary and discriminatory enforcement." *Id.* at 108. Furthermore, the degree of clarity required depends on the type of regulation:

> Economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses . . . can be expected to consult relevant legislation in advance of action. . . . The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (footnotes omitted).

Although portions of Regulation 61-12 fall short of mathematical precision, we are satisfied that a reasonable person, reading the regulation in its entirety and in the context of South Carolina statutes, would be able to interpret the regulation and determine what is required and what conduct is prohibited. For example, § 205(C)(1), the violation of which would allow the most serious penalty of the sections identified as vague by the abortion clinics, provides that abortion-clinic physicians be "properly qualified by training and

15

experience to perform pregnancy termination procedures." The abortion clinics argue that they do not understand how physicians need to be qualified to satisfy this provision. Yet, physicians routinely hold themselves out as qualified to practice in given areas based on their training and experience, and such a standard is routinely applied in the medical field to define whether a physician breached the ordinary standard of care or whether a physician is competent to perform a specialized surgery. *See, e.g.*, *Hoeffner v. The Citadel*, 429 S.E.2d 190, 192 (S.C. 1993) (requiring expert testimony to determine defendant doctor's standard of care and breach thereof). In short, physicians have no difficulty in stating that they are qualified by training and experience to practice in a given area or to perform specified procedures. We believe that the other challenged provisions can similarly be followed by reasonably prudent abortion providers who are mindful of their patients' health and safety.

The most unclear provision in Regulation 61-12 may be Chapter 10, which provides that "[c]onditions arising that have not been addressed in these regulations shall be managed in accordance with the best practices as interpreted by the Department." But this provision essentially appears to give the DHEC no power beyond its ability to promulgate further regulations as they become necessary. Moreover, any violation of Chapter 10 could only amount to a "Class III" violation, which would call for nothing more than a warning sanction. Accordingly, we can see no reason to conclude that the imprecision of this particular provision violates the abortion clinics' due process rights.

In addition to concluding that persons of reasonable intelligence would be able to understand what is required of them by Regulation 61-12, we note that the penalties are civil rather than criminal. Regulation 61-12 divides its penalties into three classes, and a Class I offense, the most serious, is subject, on the first offense, to a maximum fine of $1,000. DHEC Reg. 61-12, § 103(F). A Class II offense is subject, on the first offense, to a maximum fine of $500, *id.*, and a Class III offense, on the first offense can lead at most, to a warning, *id.* Even when a fine is called for, there are suggested factors for determining the amount, including the facility's efforts to correct the identified problem, the facility's overall conditions, and the facility's history of compliance. *Id.* § 103(E). This consideration of the viola-

tor's good faith effort to comply makes arbitrary enforcement even less likely. Moreover, as observed in *Village of Hoffman Estates*, we can expect abortion clinics to consult relevant legislation in advance of action or to seek clarification from appropriate administrative sources when necessary. *See* 455 U.S. at 498.

In the context of a facial challenge to a regulation, it is inappropriate to speculate regarding a worst-case scenario. *See Hill*, 530 U.S. at 733 (noting that "speculation about possible vagueness and hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid `in the vast majority of its intended applications'" (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960))). Accordingly, we affirm the district court's conclusion that Regulation 61-12 is not unconstitutionally vague.

V

South Carolina, in its cross-appeal, challenges the district court's ruling that § 102(F)(2) of Regulation 61-12 is unconstitutional. That section provides: "Department inspectors shall have access to all properties and areas, objects, records and reports, and shall have the authority to make photocopies of those documents required in the course of inspections or investigations." The district court stated that because South Carolina identified "no compelling interest in the disclosure of identifying information" — i.e., information that reveals to the State the names of patients procuring abortions — § 102(F)(2) violates the patient's constitutional right to privacy "insofar as it requires access to identifying information." In a footnote, the court allowed that "[t]his constitutional problem can be cured by the plaintiffs redacting the documents to remove such information." South Carolina contends that, notwithstanding the district court's conclusion, it needs the information to monitor abortions and to assure compliance with the health-care standards in Regulation 61-12 aimed at preserving maternal health. It notes that even the National Abortion Federation, in its "Standards for Abortion Care," states that the "maintenance of complete and accurate records is essential for quality patient care and meaningful review of services." The Federation's "Standards of Abortion Care" explains that the "reporting of abortion procedures and complications to appropriate private and legally sanctioned public agencies generally improve[s] family planning services

17

and public health information." In addition, South Carolina argues that its statutes and regulations provide adequately for the privacy of patients' records.

The abortion clinics contend, on the other hand, that disclosure of patients' names and records violates the patients' privacy rights as defined in *Whalen v. Roe*, 429 U.S. 589, 597 (1977) (recognizing a right to privacy "in avoiding disclosure of personal matters"), and *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (requiring the State to offer a "compelling" interest before disclosing protected information). They argue that the confidentiality of patient information is "vital to women seeking abortions because they may face harassment from their partners, co-workers, and others for having decided to undergo an abortion." And they maintain that disclosing the information also "may force patients to delay their abortions until they can go to a state where their confidentiality will be maintained; to go to an unlicenced provider; or to attempt to self-abort [sic]. Each of these alternatives poses serious risks to patient health."

South Carolina's abortion statute requires that each abortion be reported to the DHEC within seven days after the abortion is performed. *See* S.C. Code Ann. § 44-41-60. The same statute authorizes the DHEC to promulgate regulations for the maintenance of medical records and reports. *See id.* §§ 44-41-70, 44-41-75.

To carry out its mandate, the DHEC promulgated Regulation 61-12, comprehensively providing for the generation and maintenance of records and reporting as necessary to carry out the licensing and regulation of abortion clinics. Regulation 61-12 requires that written consent be obtained from each patient obtaining an abortion and that a copy of the consent be maintained in the patient's record. *See* DHEC Reg. 61-12, § 201(b)(10). The regulation prescribes a list of items that must be included in patients' medical records relating to any abortion procedure performed and requires that the records be maintained in a safe location for a minimum of ten years. *See id.* §§ 401, 402. It also requires that each laboratory test be documented in a report and maintained as part of the patient's record. *See id.* § 304(E). With respect to each employee at an abortion clinic, Regulation 61-12 requires that the clinic maintain a personnel file, documenting the employee's job description, work assignments, in-service education, licensure, if

18

applicable, and tuberculosis skin-testing. *See id.* § 204(H). In-service training programs, providing employees training in specified areas at least once annually, must also be documented, reflecting the program's contents and attendance. *See id.* § 204(F). The regulation also requires that clinics maintain records of all controlled substances. *See id.* § 303(F). It mandates that the clinics conduct sterilization procedures and maintain records of those procedures, as well as safety-testing equipment and alarms. *See id.* §§ 602(C), 702. And the regulation requires that the clinic maintain on its premises the documentation evidencing its licensure in a manner sufficient to inform patients. *See, e.g.*, *id.* §§ 203, 208, 209.

In addition to its requirements for generating and maintaining records, Regulation 61-12 imposes reporting requirements. Abortion clinics must report each abortion and each accident or incident to the Vital Records and Public Health Statistics section of the DHEC. *See id.* § 403. In addition, the abortion clinics are subject to regular inspections, and DHEC inspectors are given access to all "records and reports" and authority to make photocopies of those documents "required in the course of inspections or investigations." *See id.* § 102(F)(2).

The abortion clinics do not seriously challenge the requirement of generating and maintaining records. Indeed, they would have to acknowledge that each type of record relates directly to the health or safety requirements imposed by Regulation 61-12. And the Supreme Court has found that requiring documentation of this type is in the public interest and does not violate any constitutional right to privacy. *See Whalen v. Roe*, 429 U.S. 589 (1977); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976).

In *Whalen*, the Supreme Court upheld, against constitutional attack, the maintenance of a centralized State computer file that contained the names and addresses of all persons who had obtained certain prescription drugs, for which there was both a lawful and an unlawful market. Recognizing that patients have a protected interest "in avoiding disclosure of personal matters" as well as an interest in "independence in making certain kinds of important decisions," 429 U.S. at 599-600, the Supreme Court nonetheless held that "the New York program does not, on its face, pose a sufficiently grievous threat to either inter-

19

est to establish a constitutional violation." *Id.* at 600. The Court noted that the invasions of privacy necessary for the public health were not "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care," explaining:

> Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient.

*Id.* at 602. In response to the appellants' suggestions that the information could become public through deliberate or negligent conduct in numerous ways, the Court stated that "the remote possibility that judicial supervision of the evidentiary use of particular items of stored information will provide inadequate protection against unwarranted disclosures is surely not a sufficient reason for invalidating the entire patient-identification program." *Id.* at 601-02.

Similarly, in *Danforth*, the patients attacked a recordkeeping provision of Missouri's abortion statute contending, among other things, that it invaded the patient's "right to privacy in the physician-patient relationship." 428 U.S. at 57. Under the Missouri statute, abortion providers were required to fill out state forms that were to be maintained confidentially and would be used only for statistical purposes. Nevertheless, the information was reportable to local, state and national public health officers. In upholding these requirements, the Court said: "Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." *Id.* at 80. The Court explained that the requirements of confidentiality and the limited duration of document-maintenance (seven years) "assist[ed] and persuad[ed]" the Court to conclude that the recordkeeping requirement had no "legally significant impact or consequence on the abortion decision or on the physician-patient relationship." *Id.* at 81.

Similarly, we noted in our previous opinion in this case that the recordkeeping and copying requirements were justified to ensure

20

compliance with health care standards. *Bryant I*, 222 F.3d at 171. We added that this was particularly so in view of the regulation's requirement that all records be treated as confidential. While our conclusion in *Bryant I* was limited to holding that the recordkeeping requirement did not unduly burden the abortion decision, the observation is still relevant to this discussion on privacy insofar as it supports a conclusion that recordkeeping requirements are meaningful to the overall health and safety purposes of Regulation 61-12.

Accordingly, we conclude that South Carolina's recordkeeping requirement does not *per se* violate the Constitution. This does not, however, answer the entire question of whether the reporting requirements and the potential for publication through court proceedings renders the requirements unconstitutional, as the abortion clinics argue. South Carolina must still demonstrate that the records it requires that contain personal information will be maintained in confidence to the extent possible as it uses the records to ensure the health and safety of its citizens. *See Whalen*, 429 U.S. at 602 (noting that disclosure to public health agencies are "an essential part of modern medical practice"); *Walls*, 895 F.2d at 192 (recognizing limits on an individual's right to privacy and requiring the government to move a compelling interest only if there will be disclosure of protected information). We conclude that South Carolina's statutes and Regulation 61-12 assure the patient's confidentiality, such that protected information will not be disclosed.

First, with respect to every facility licensed by the DHEC, the confidentiality of patient files is demanded. Section 44-7-310 of the South Carolina Code provides that the information received by the DHEC "which does not appear on the face of the license may not be disclosed publicly in a manner as to identify individuals or facilities." S.C. Code Ann. § 44-7-310. The only exception provided is for a proceeding involving licensure or an order of court. *Id.* Similarly, § 44-7-315, which authorizes the disclosure of information relating to licensed facilities, provides that "the Department may not disclose the identity of individuals present in a facility licensed by the department pursuant to this article or subject to inspection by the department." S.C. Code Ann. § 44-7-315.

The abortion statute itself, which requires that each abortion be reported to the DHEC, also provides that "the names of the patient

21

and physician may not be reported on the form or otherwise disclosed to the state registrar." S.C. Code Ann. § 44-41-60. Finally, even in a court proceeding involving abortion licensure, the abortion statute requires that the court make an explicit ruling whether "the anonymity of any woman upon whom an abortion is performed or attempted shall be preserved from public disclosure if she does not give her consent to such a disclosure." S.C. Code Ann. § 44-41-360. In making that ruling, the court is explicitly required to apply the appropriate constitutional standard. *See id.*

Consistent with these statutory mandates to preserve the privacy of patients, Regulation 61-12 explicitly requires confidentiality of patients' records. Section 402 provides that "[a]ll records shall be treated as confidential." Moreover, employees working in abortion clinics must be trained on the "confidentiality of patient information and records, and protecting patient rights." *See* DHEC Reg. 61-12, § 204(F)(3). Section 209 requires that each licensed facility have "written policies and procedures to assure the individual patient the right to dignity, *privacy*, safety, and to register complaints with the department." *Id.* § 209(A) (emphasis added).

While § 102(F) authorizes a State inspector to review records for compliance with the abortion statute and with Regulation 61-12, that authorization to inspect records does not authorize the inspector to breach the statutory and regulatory mandates to protect the patient's privacy. The Supreme Court has recognized that "[r]equiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Whalen*, 429 U.S. at 602. As the Court observed in *Danforth*, "recordkeeping of this kind, if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment." 428 U.S. at 81.

For these reasons, we conclude that the recordkeeping and information reporting mechanisms adopted by South Carolina in its statutes and in Regulation 61-12 do not require unnecessary disclosure of protected information, in violation of the privacy right identified in *Whalen*, 429 U.S. at 599-600. Even though the abortion clinics can conceive of circumstances where patients' privacy rights could be

22

violated, either deliberately or through negligence, we cannot assume that the confidentiality measures adopted by South Carolina to prevent such violations will be administered improperly. *Whalen*, 429 U.S. at 601-02.

Accordingly, we reverse the district court's conclusion that Regulation 61-12 violates patients' privacy rights, as identified in *Whalen*, insofar as it permits the disclosure of patient identification to the State officials administering the program. *See Whalen*, 429 U.S. at 602-03 (finding constitutional a State maintained computer file containing the *names* and addresses of patients for whom drugs had been prescribed).

## VI

In sum, on the abortion clinics' constitutional challenges to Regulation 61-12 based on (1) a standardless delegation of licensing authority, (2) an alleged violation of the Establishment Clause, and (3) a claim of vagueness, we reject the abortion clinics' arguments and affirm the district court. On South Carolina's cross-appeal challenging the district court's ruling that § 102(F) of Regulation 61-12 is unconstitutional, we reverse.

*AFFIRMED IN PART REVERSED IN PART*

KING, Circuit Judge, dissenting:

We today address significant questions arising from one of the most divisive and contentious issues in our nation's history. Since *Roe v. Wade* was decided by the Supreme Court in 1973, the struggle over the existence and scope of a woman's constitutional right to choose has been a constant part of our political landscape. In recent years, state legislatures have taken an increasingly active role in regulating access to abortion; in many places, burdensome regulations have made abortions effectively unavailable, if not technically illegal. It is this type of regulation — micromanaging everything from elevator safety to countertop varnish to the location of janitors' closets —

23

that is challenged in this case. 24 S.C. Code Ann. Regs. 61-12 (Cum. Supp. 2001) (the "Regulation").[1]

The State of South Carolina is entitled to make a value judgment, as a matter of its public policy, to favor childbirth over abortion. *Rust v. Sullivan*, 500 U.S. 173, 192-93 (1991); *Maher v. Roe*, 432 U.S. 464, 474 (1977). In accordance with this prerogative, South Carolina has made its preference clear. For example, while a citizen of the Palmetto State may obtain a "Choose Life" automobile license plate from the authorities, he may not obtain a "Choose Choice" license plate.[2] S.C. Code Ann. § 56-3-8910 (West 2002).[3] Insofar as the legislature in South Carolina wishes to limit the choices of its female citizens, it has been largely successful. Eighty percent of the State's counties lack an abortion provider, and between 1992 and 1996, the number of such providers in the State fell from eighteen to fourteen. Stanley K. Henshaw, "Abortion Incidence and Services in the United States,

---

[1] Although South Carolina claims that the Regulation treats abortion clinics similarly to other entities regulated by the State, several facts belie this assertion. First, as Judge Hamilton aptly pointed out the first time this case was appealed, "South Carolina does not require licensing of physicians' offices outside of the abortion context." *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 178 (4th Cir. 2000) (Hamilton, J., dissenting). Second, the South Carolina Department of Health and Environmental Control ("DHEC"), in writing the Regulation, specifically tailored it to abortion clinics. *Id.* at 184-85. Finally, the Regulation contains some provisions, such as the clergy referral requirement discussed below, *see infra* Part II, that are found nowhere else in the South Carolina Code.

[2] I express no view on whether this policy is impacted by our recent decision in *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002).

[3] Other South Carolina statutes demonstrate a similar hostility to a woman's constitutional right to seek an abortion. *See, e.g.*, S.C. Code Ann. § 1-1-1035 (West 2002) (prohibiting Medicaid funds from being used to fund abortions); S.C. Code Ann. § 44-41-340(A)(2) (West 2002) (requiring that women seeking abortions be provided with a brochure that includes "materials designed to inform the woman of the probable anatomical and physiological characteristics of the embryo or fetus at two-week gestational increments"); S.C. Code Ann. § 44-41-40 (West 2002) (entitling private hospitals to refuse to perform abortions).

1995-1996," *Fam. Plan. Persp.*, Vol. 30, No. 6, November/December 1998.

South Carolina is not, however, entitled to adopt and pursue an anti-abortion agenda at the expense of constitutional rights. Having carefully examined the constitutional challenges made by Greenville Women's Clinic and other abortion providers (collectively, the "Plaintiffs") to aspects of the Regulation, I am inexorably led to conclude that certain of its provisions violate the Constitution. I part company with my friends in the majority in four respects:

> First, the majority improperly reverses the district court on the informational privacy issue;
>
> Second, the majority ignores the conflict between the clergy referral requirement and the Establishment Clause;
>
> Third, the majority upholds unconstitutionally vague and ambiguous provisions of the Regulation; and
>
> Fourth, the majority endorses a standardless delegation of state power that contravenes the Due Process Clause.

I will discuss each of these points in turn.[4]

---

[4] The majority also improperly focuses on the fact that the Plaintiffs have challenged the Regulation on its face. In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court articulated a "no set of circumstances" test that would, if applicable, make a facial challenge virtually impossible to win. However, the *Salerno* doctrine is an embattled one at best, and its continuing viability is the subject of intense debate. In any event, the Court has indicated that the *Salerno* standard does not apply to three of the four legal claims asserted here. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313-14 (2000) (analyzing a facial challenge in an Establishment Clause case without applying *Salerno*); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (same for privacy); *Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality) (same for vagueness). So long as plaintiffs possess standing to raise a claim, facial challenges are generally evaluated under the same standard as any other constitutional challenge, and the majority simply confuses the issues in suggesting otherwise.

I.

On the first of the Plaintiffs' four challenges to the Regulation, I would affirm the district court and hold § 102(F)(2) (the "Disclosure Provision") to be unconstitutional.[5] The Disclosure Provision concerns the State's access to private medical records,[6] and the district court properly found that South Carolina had failed to demonstrate a sufficient interest in obtaining information identifying the female patients of abortion clinics.[7] The majority incorrectly reverses the district court on this issue.

The Supreme Court has identified two types of privacy rights, both rooted in the Fourteenth Amendment. The first is the right of citizens to make certain personal choices, such as those discussed by the Court in *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny. The second protects "informational privacy," and it consists of a citizen's right to control the release of personal information. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). The public disclosure of private medical

---

[5] The Disclosure Provision provides, in pertinent part, that:

> Department inspectors shall have access to all . . . records and reports, and shall have the authority to make photocopies of those documents required in the course of inspections or investigations.

24 S.C. Code Ann. Regs. 61-12, § 102(F)(2) (Cum. Supp. 2001).

[6] Pursuant to § 401(A)(1) of the Regulation, abortion clinics in South Carolina are required to maintain records with various identifying information, including:

> name, address, telephone number, social security number, date of birth, father's and mother's names when patient is a minor, husband's name, and name, address and telephone number of person to be notified in the event of an emergency.

24 S.C. Code Ann. Regs. 61-12, § 401(A)(1) (Cum. Supp. 2001).

[7] By definition, the Regulation only applies to clinics "in which any second trimester or five or more first trimester abortions per month are performed." 24 S.C. Code Ann. Regs. 61-12, § 101(B) (Cum. Supp. 2001). However, for ease of reference, I use the terms "clinics" or "providers," without any further elaboration, to refer to those facilities subject to the Regulation.

26

records, and the personal and confidential information contained therein, implicates this informational privacy right.

Of course, the right to informational privacy is not absolute, and a state does not necessarily violate that right by requiring disclosure of private medical records. *Id.* at 602. To determine whether the Disclosure Provision infringes the right to informational privacy, we consider three factors. First, the information must fall within the zone of the constitutional right to privacy. *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990). Second, if the information is within this zone, then "the defendant has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Id.* Finally, any safeguards provided by the State against improper disclosure will serve to dilute the individual's privacy interest. Overall, the State's need for private information must be balanced against the interest of the person whose privacy is at stake. *Id.* at 192-94. As the district court properly determined, South Carolina has failed to demonstrate a sufficient need for access to patients' private identifying information, rendering its Disclosure Provision invalid. *See Greenville Women's Clinic v. Bryant*, Memorandum of Decision, CA No. 6:96-1898-20 (D.S.C. Aug. 31, 2001) (the "Memorandum of Decision").

A.

The constitutional right to privacy in pregnancy-related medical information is firmly established. Indeed, the Supreme Court has emphasized that the decision of a woman to exercise her constitutional right to choose "is an intensely private one that must be protected in a way that assures anonymity." *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 766 (1986), *overruled in part on other grounds*, *Planned Parenthood v. Casey*, 505 U.S. 833 (1992); *see Hodgson v. Minnesota*, 497 U.S. 417, 463 (1990) ("Few decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision . . . whether to end her pregnancy.") (quoting *Thornburgh*, 476 U.S. at 772); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (subjecting drug testing program to scrutiny under the Fourth Amendment because it threatened to reveal private information such as pregnancy). Given the Court's recognition of the

private nature of reproductive decisions, the women seeking services at abortion clinics in South Carolina unquestionably possess a constitutionally protected privacy interest in the information sought by the State under the Disclosure Provision.

B.

In assessing the validity of the Disclosure Provision, we must also consider whether South Carolina has established "a compelling governmental interest in disclosure [that] outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192; *see also Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977). In this regard, the pivotal question is whether the State can sufficiently justify its request for disclosure of constitutionally protected information.

The Supreme Court has recognized that a state has an interest in protecting maternal health, and that it may properly collect otherwise private medical information related to this purpose. *See Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 80 (1976). However, as *Walls* informs us: the "regulation `may be justified only by compelling state interests, and must be narrowly drawn to express only those interests.'" *Walls*, 898 F.2d at 192 (quoting *Carey*, 431 U.S. at 686).

South Carolina has failed to demonstrate that it has a compelling need to copy any patient identifying information. The only justification offered by the State is that such information is needed in order to investigate complaints against abortion clinics. However, the State has failed to demonstrate a need to contact patients in such situations. In fact, complaints involving compliance with issues such as structural building requirements and staff qualifications could be fully investigated by the State without contacting the female patients. And on issues involving patient care, the affected patients would most likely consent to the disclosure of their identity.

In limited situations, the State might have a valid need to obtain a patient's identity in order to investigate anonymous complaints or to seek corroborating evidence. However, South Carolina's interest in obtaining patients' identifying information in those limited situations does not support the disclosure requirement in the Regulation, which gives the State access to information identifying *every* patient of *every*

28

abortion clinic in the State. Such a disclosure requirement is vastly overbroad: in the apparent expectation that, someday, some of the information might be useful, it tramples the privacy interest of every woman who seeks an abortion at a South Carolina clinic.

In short, South Carolina has failed to demonstrate a compelling need for access to information identifying every patient of the abortion clinics in the State. As the district court properly recognized, the goals of the Disclosure Provision would be adequately served if the State is provided with access to *redacted* records. Memorandum of Decision, at 8-9. And in those limited instances where redacted records might be insufficient, the State has failed to narrowly tailor the Disclosure Provision to serve its interest in disclosure.

C.

In assessing whether the Disclosure Provision contravenes the right to informational privacy, we must also consider the probability of the unauthorized disclosure of the information collected by the State. *Walls*, 895 F.2d at 194; *see also Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487-88 (4th Cir. 1992). Any safeguards designed by the State to prevent such improper disclosure serve to weaken a woman's privacy interest and reduce the need to prohibit South Carolina from collecting the information in the first place. *Walls*, 895 F.2d at 194.

In this case, the State has failed to show that it will protect the private medical information of female patients. To begin with, the statutes relied on by South Carolina do not erect an absolute bar to public disclosure of such information. *See* S.C. Code Ann. § 44-7-310 (West 2002);[8] S.C. Code Ann. § 44-7-315 (West

---

[8] Section 310, regarding "Certain information not to be disclosed publicly," states:

> Information received by the Office of Health Licensing . . . may not be disclosed publicly in a manner as to identify individuals or facilities *except* in a proceeding involving the licensure or certification of need of the facility or licensing proceedings against an employee of the facility or as ordered by a court of competent jurisdiction.

S.C. Code Ann. § 44-7-310 (West 2002) (emphasis added).

2002).[9] To the contrary, those statutes contain gaping holes in the protections they afford against public disclosure. For example, § 44-7-310 authorizes the public disclosure of identifying information during licensure proceedings. And § 44-7-315 *requires*, upon written request, the public disclosure of information obtained through inspection.

While § 44-7-315 serves to prohibit South Carolina from "disclos-[ing] the identity of individuals present in a facility," it fails to explain what "present in a facility" is intended to mean. Under one interpretation, it might only protect the identity of persons present in the facility at the time records are released. Under another plausible interpretation, it could cover only those persons typically present in the facility — namely the permanent staff. And among other possible interpretations, it could mean that the identity of every person ever present in the facility may not be disclosed, which would include investigators and other State officials. In short, this ambiguous statutory language does not sufficiently ensure the confidentiality of the female patients of South Carolina abortion clinics.

Second, despite the State's assurances of confidentiality, private medical information has been leaked to the public. Although George Moore, the Director of Outpatient and Home Care in the Department of Health and Environmental Control ("DHEC"), testified that "strict confidentiality is maintained as it always is, records are secured in the office, and individual records are not released under Freedom of Information Act requests," South Carolina has failed to follow this directive. In point of fact, the evidence shows that abortion protesters distributed a flyer containing a photocopy of a medical record obtained from DHEC concerning a fifteen-year-old girl's pregnancy termination. Furthermore, physicians testified that similar types of confidential information collected by the State have been made available to the public.

---

[9] Section 315, titled "Disclosure of information regarding facility or home," reads, in pertinent part:

> Information received by the Division of Health Licensing . . . *must be disclosed publicly* upon written request to the department. . . . The department *may not disclose the identity of individuals present in a facility* licensed by the department . . . .

S.C. Code Ann. § 44-7-315 (West 2002) (emphasis added).

30

D.

It is of significance, in assessing the validity of the Disclosure Provision, that the recordkeeping requirements established by South Carolina differ markedly from the types of data collection systems other courts have approved. For example, in *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court concluded that New York was constitutionally permitted to obtain and record, in a centralized computer file, the names and addresses of all persons who obtained, pursuant to a doctor's prescription, certain controlled substances for which there were both lawful and unlawful markets. *Id.* at 591-94. In that situation, New York provided elaborate security against the improper disclosure of private medical information, including storing the records in a receiving room surrounded by an alarmed and locked wire fence, and requiring destruction of the records after five years. *Id.* at 593-94. Further, the public disclosure of patients' identities was expressly prohibited by both a statute and an administrative regulation. *Id.* at 594-95.

The situation in this case differs markedly from *Whalen* in at least three respects. First, as discussed above, *see supra* Part I.C., South Carolina's Disclosure Provision does not sufficiently ensure the confidentiality of private medical information. Second, the medical records of abortion patients differ in substance from the records collected in *Whalen*. In *Whalen*, the information compiled on drug use provided potentially incriminating evidence about the patients themselves, not just about the medical doctors who wrote the prescriptions. *Id.* at 592. Here, the private medical information sought by South Carolina is not for the purpose of investigating the female patients of abortion clinics. Rather, the State claims that such information will facilitate its investigations of the clinics providing abortion services.[10] Finally, the

---

[10] Where this Court has permitted a government entity to collect and maintain private information, the government interest has consistently related to the person whose privacy is at stake. *See Walls*, 895 F.2d at 192-93 (upholding data collection of police department applicants because of state interest in obtaining personal information of employees); *Hodge v. Jones*, 31 F.3d 157, 166 (4th Cir. 1994) (upholding data collection of reports of child abuse to aid future investigations of parents). The majority has unjustifiably extended these earlier decisions by now allow-

31

plaintiffs in *Whalen* claimed to fear the disclosure of their medical records because of the stigma attached to the use of controlled substances. *Id.* at 595 n.16. In this case, women seeking abortions in South Carolina have a great deal more to fear than stigma. The protests designed to harass and intimidate women entering abortion clinics, and the violence inflicted on abortion providers, provide women with ample reason to fear for their physical safety. *See Thornburgh*, 476 U.S. at 767 n.12.

For these reasons, the identifying information contained in medical records of women seeking services at abortion clinics in South Carolina must be kept confidential. The majority, in my view, is entirely unable to justify South Carolina's broad access to unredacted records, and it has not shown that the purported safeguards ameliorate privacy concerns. In sum, the Disclosure Provision violates the constitutionally protected right of informational privacy, and the majority is incorrect to conclude otherwise.

## II.

I also disagree with the majority on the constitutionality of § 307 of the Regulation (the "Consultation Provision").[11] The Plaintiffs

---

ing South Carolina to collect patient information in order to investigate clinics.

In the only situation where the need to obtain private information related to a third party, the scope of the privacy invasion was narrowly tailored to the need for disclosure. In *Watson*, the plaintiff, who asserted a claim against a Red Cross donation center, was allowed to obtain discovery from an anonymous blood donor. 974 F.2d at 484. Thus, the interest in obtaining the information related to the Red Cross, while it was the donor whose privacy was compromised. However, in that case, only one donor's identity was at stake, and it was revealed only to the court. The trial court allowed the plaintiff to submit questions to counsel for the anonymous donor, but the identities of the donor and the donor's counsel were known only to the court. *Id.* at 484, 487. In contrast, the South Carolina Regulation provides the State with access to *every* patient record without any judicial supervision on how the information is used.

[11] The Consultation Provision of the Regulation, found in § 307, requires that:

32

maintain that the Consultation Provision unconstitutionally compels South Carolina abortion clinics to form professional affiliations with members of the clergy and entangles the State in religious matters.[12] The majority, on the other hand, views the Plaintiffs' concerns as "grounded on a substantial misreading of § 307, imputing obligations and relationships that are not prescribed by the regulation." *Ante* at 10. Specifically, the majority believes that "[t]hese arrangements might amount to no more than a list of clergy and other specialists or a readily accessible telephone book to consult as required by the needs of a particular patient," and that no arrangement for religious counseling need be made until a patient requests the referral. *Ante* at 10-11.

In concluding that the Consultation Provision complies with the Establishment Clause, the majority interprets the clergy referral requirement in a plainly implausible way. Under a reasonable inter-pretation of the Consultation Provision, abortion providers in South Carolina must establish professional affiliations with members of the clergy in order to ensure that religious consultation and referral ser-vices will be available to their female patients. And to enforce this Provision, the State inevitably must establish and enforce religious

---

> Arrangements shall be made for consultation or referral services in the specialties of obstetrics/gynecology, anesthesiology, sur-gery, psychiatry, psychology, clinical pathology and pathology, *clergy*, and social services, as well as any other indicated field, to be available as needed.

24 S.C. Code Ann. Regs. 61-12, § 307 (Cum. Supp. 2001) (emphasis added).

[12] Plaintiffs also contend that the Consultation Provision improperly gives religious leaders veto authority over the issuance of abortion licenses. Because I would find that the Provision violates the Establish-ment Clause in excessively entangling the State with religious counsel-ing, I would not reach the issue of whether the Consultation Provision might also give religious leaders too much authority over government functions. *See generally Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982). I do, however, address a similar contention in dealing with the Regulation's improper delegation of state authority. *See infra* Part IV.

criteria. Because the Establishment Clause[13] precludes South Carolina from becoming entangled with religion in this way, the Consultation Provision is unconstitutional.

A.

In South Carolina, duly promulgated state regulations, like statutes, are to "receive practical, reasonable and fair interpretation consonant with the purpose, design and policy of lawmakers." *Whiteside v. Cherokee County Sch. Dist. No. 1*, 428 S.E.2d 886, 888 (S.C. 1993). Viewed in this way, the express terms of the Consultation Provision cannot support the majority's strained interpretation; the Provision unequivocally requires clinics to establish prearrangements for consultation services with members of the clergy. Although the services must be "available as needed," the arrangements plainly must be made before a clinic can obtain a license. Moreover, the "arrangement" requirement of the Consultation Provision indicates that abortion providers must do more than merely make a telephone book available to their female patients. Indeed, for a female patient to have access to specialists in the fields specified in the Consultation Provision, such as anesthesiology or surgery, a telephone book would not be particularly helpful. And the majority gives no reason why the mandated "arrangements" with members of the clergy should be treated differently.

Further, the majority's interpretation of the Consultation Provision inexplicably ignores the explicit intent of the South Carolina official who wrote the Regulation. According to Mr. Moore, the Director of Outpatient and Home Care in the Division of Licensing of DHEC, and the state official who drafted the Regulation, clinics must make *prearrangements* for consultation.[14] In fact, Mr. Moore testified that

---

[13] The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. 1. It has been incorporated against the states through the Fourteenth Amendment. *Zelman v. Simmons-Harris*, 534 U.S. ___, 122 S. Ct. 2460, 2465 (2002); *Everson v. Bd. of Educ. of Ewing Township*, 330 U.S. 1, 15-16 (1947).

[14] In general, an agency's interpretation of its own regulation deserves considerable deference. *See Brown v. S.C. Dep't of Health & Envtl. Control*, 560 S.E.2d 410, 415 (S.C. 2002). Although a position taken in liti-

prior arrangements are required with "maybe two or three different denominations just to be on call." Although "[i]t probably wouldn't be a Catholic priest," Mr. Moore opined that they "would just have to have Protestant and whatever else." Given the plain terms of the Consultation Provision and the unequivocal statements of its drafter, abortion providers in South Carolina must, in order to comply with the Provision, do more than merely provide their patients with a telephone book. *Ante* at 10.

B.

It is with this interpretation of the clergy referral requirement in mind that I turn to an assessment of the constitutionality of the Consultation Provision. In order to determine whether a regulation violates the Establishment Clause, we must apply the three-prong test that the Supreme Court articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). First, the regulation must have a secular purpose. Second, the primary effect of the regulation must neither advance nor inhibit religion. And third, the regulation must not foster an excessive government entanglement with religion. *Id.* at 612-13. As explained below, the Consultation Provision clearly violates *Lemon*'s third prong, and it probably contravenes the second prong as well.

1.

The first prong of the *Lemon* test presents a fairly low hurdle for the State. *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir.), *cert. denied*, 122 S. Ct. 465 (2001). Here, the Consultation Provision

---

gation (which is one way Mr. Moore's view could be characterized) may be treated differently, a policy statement should be given deference where it reflects the considered and reasoned judgment of the agency, rather than a post hoc rationalization of an enforcement decision. *See Monongahela Power Co. v. Reilly*, 980 F.2d 272, 279 (4th Cir. 1993). Mr. Moore's testimony therefore is entitled to consideration in assessing what the Consultation Provision requires. Further, because South Carolina inspectors have broad discretion to determine what might violate the Consultation Provision, abortion providers would be well advised to heed DHEC's warning on how the law will be enforced.

35

appears to have a secular purpose. The State promulgated it for the ostensible purpose of protecting maternal health and to ensure that women seeking abortion services have access to experts in a range of specialty fields. The first prong of *Lemon* contemplates an inquiry into the subjective intentions of the government. *See Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) ("[I]t is appropriate to ask `whether government's actual purpose is to endorse or disapprove of religion.'") (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (O'Connor, J., concurring)). Without more evidence of a religious purpose, the Consultation Provision survives the first prong of the *Lemon* test.

2.

By contrast, the Consultation Provision in all likelihood fails *Lemon*'s second prong. This prong's "primary effect" test requires an objective assessment, rather than a subjective one, and it measures whether the principal effect of government action "is to suggest government preference for a particular religious view or for religion in general." *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1345 (4th Cir. 1995). Here, the Consultation Provision compels physicians providing abortion services to establish affiliations with religious institutions. This mandatory affiliation seems to convey the message that the State endorses the beliefs of the religious counselors. Further, the clergy referral requirement appears to promote the religious mission of those institutions given referral arrangements.[15] Under our Constitution, however, the government is not

---

[15] Unlike those situations where courts have permitted religious groups to provide state-sponsored counseling services, the message of the clergy in this case is purely religious. Further, the counseling services here *must* be provided by pervasively sectarian organizations. South Carolina is not merely allowing religious groups to participate on an equal basis in grant programs; it has facilitated religious indoctrination. In *Bowen v. Kendrick*, 487 U.S. 589 (1988), the Supreme Court held that religious groups could receive funds from the government in order to counsel teenagers regarding adolescent sexual relations. However, the counseling services were not inherently religious, the grant program directed that the money should be spent for secular purposes, and the groups providing counseling services were not pervasively sectarian. *See id.* at 604-05 ("The services to be provided under the AFLA are not religious in character, nor has there been any suggestion that religious institutions or organizations with religious ties are uniquely well qualified to carry out those services.") (internal citation omitted); *see also id.* at 610-12.

36

permitted to sponsor the indoctrination of religious beliefs in this manner.

More disturbingly, South Carolina has indicated it will play favorites among religions in enforcing the Consultation Provision.[16] The interpretation given to this Provision by DHEC's Division of Licensing unquestionably violates the hallmark of the Establishment Clause, which is that the government must be neutral with respect to different religious beliefs. According to Mr. Moore, referral arrangements with members of the clergy must include at least one Protestant minister, and they need not include a Catholic priest. This governmental preference for certain religious beliefs violates what Judge Luttig has characterized as "the most fundamental tenet of the Establishment Clause [which] is that the imprimatur of the state shall not directly or indirectly be placed upon one religious faith over another." *Id.* at 1346 (Luttig, J., concurring). Given these defects, the Consultation Provision almost certainly contravenes the second prong of the *Lemon* test.

3.

In any event, the Consultation Provision surely fails the third prong of the *Lemon* test, because it excessively entangles the State with religion. Under *Lemon*'s final prong, the Court requires that we analyze "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Lemon*, 403 U.S. at 615. In this case, the benefited institutions are quintessentially religious. Unlike the religious groups that have elsewhere been allowed to participate in government programs, the institutions that receive the

---

[16] If the Consultation Provision is enforced in a manner where certain religions are actually favored, as Mr. Moore suggests, it should be enjoined without applying the *Lemon* analysis. *Larson v. Valente*, 456 U.S. 228, 252 (1982) ("[T]he *Lemon v. Kurtzman* `tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions."); *see also County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 604 (1989) ("Whatever else the Establishment Clause may mean. . . it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed.").

benefit of referral arrangements under the Consultation Provision are pervasively sectarian. By virtue of the Consultation Provision, churches in South Carolina have been given additional opportunities to proselytize; female patients of abortion providers will now be referred to a preacher at the direction of the State. Such a referral requirement is unprecedented, and it should be recognized as unconstitutional.

Further, the State's enforcement of the Consultation Provision will inevitably entangle the State in religious counseling. DHEC inspectors and bureaucrats must determine not only whether the mandated clergy referral arrangements have been made, but also whether the arrangements with members of the clergy satisfy criteria that are necessarily religious. To enforce the Consultation Provision, the State must inquire into who qualifies as an appropriate member of the "clergy," and it must decide whether the referral arrangements are sufficient to meet the religious needs and preferences of female patients. In requiring DHEC inspectors to determine whether abortion providers have complied with these religious requirements, the Consultation Provision excessively entangles the State in religious indoctrination. As such, it violates the Establishment Clause, and it should be invalidated.

III.

While I agree with the majority that most of the challenged aspects of the Regulation are sufficiently clear to withstand a constitutional vagueness analysis,[17] I see two of those provisions as unconstitutionally vague. First, the inspectors for South Carolina have unbridled discretion to decide whether an abortion provider in that State has somehow deviated from an amorphous "best practices" requirement, which is found both in Chapter 10 and § 103 of the Regulation (the "Best Practices Provisions"). *See* 24 S.C. Code Ann. Regs. 61-12, Chapter 10 (Cum. Supp. 2001); 24 S.C. Code Ann. Regs. 61-12, § 103(C) (Cum. Supp. 2001).[18] Second, under a particularly incom-

_____

[17] In particular, I agree that §§ 102(J), 102(L), 201(B), 204, 205(C)(1), 301, 306-308, 501(A), 602(A), 604, 606, and 807 of the Regulation are not unconstitutionally vague.

[18] Chapter 10 of the Regulation provides: "Conditions arising that have not been addressed in these regulations shall be managed in accordance

38

prehensible section, abortion clinics in South Carolina must arrange for local hospital admitting privileges for either some or all of their staffs. However, exactly which staff members are required to possess such privileges is inherently ambiguous because of an unfortunately placed "and/or" connector found in § 305 of the Regulation (the "And/Or Provision"). *See* 24 S.C. Code Ann. Regs. 61-12, § 305(A) (Cum. Supp. 2001).[19] The majority unjustifiably and incorrectly ignores the fundamental vagueness of these Provisions.

The Due Process guarantee of the Fourteenth Amendment prohibits state statutes and regulations that are "so vague that men of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Further, such statutes and regulations may not be so vague that they invite arbitrary and discriminatory enforcement. *Kolendar v. Lawson*, 461 U.S. 352, 357 (1983); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (invalidating an ordinance on vagueness grounds partially because it encouraged "arbitrary and erratic arrests and convictions"); *see generally City of Chicago v. Morales*,

---

with the best practices as interpreted by the Department." 24 S.C. Code Ann. Regs. 61-12, Chapter 10 (Cum. Supp. 2001). Section 103(C) similarly states that "Class III violations are those that are not classified as Class I or II in these regulations or those that are against the best practices as interpreted by the Department." 24 S.C. Code Ann. Regs. 61-12, § 103(C) (Cum. Supp. 2001). The majority concentrates on Chapter 10 in discussing the "best practices" requirement. *Ante* at 16. However, because Chapter 10 and § 103(C) contain the same "best practices" language, I refer to them collectively as the "Best Practices Provisions."

[19] Section 305(A) of the Regulation reads:

> All staff *and/or* consulting physicians shall have admitting privileges at one or more local hospitals that have appropriate obstetrical/gynecological services or shall have in place documented arrangements approved by the Department for the transfer of emergency cases when hospitalization becomes necessary.

24 S.C. Code Ann. Regs. 61-12, § 305(A) (Cum. Supp. 2001) (emphasis added).

527 U.S. 41, 56 (1999) (plurality); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### A.

In order to be consistent with the requirements of due process, statutes and regulations with criminal sanctions must achieve a higher level of clarity than those which provide for civil penalties only. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). While the majority acknowledges this principle, it inexplicably and incorrectly assumes that violations of the Regulation carry civil penalties only. *Ante* at 4, 16. On the contrary, a violation of the general licensing article of the South Carolina Code, which applies specifically to health care facilities providing abortion services to women in South Carolina, constitutes a misdemeanor criminal offense. S.C. Code Ann. § 44-7-340 (West 2002). In order to be constitutional, the Regulation's licensing scheme must therefore be analyzed under the standard of clarity applicable to criminal offenses.

Further, even if criminal penalties were not implicated, the Regulation threatens the exercise of constitutionally protected rights. For this reason alone, it must achieve a heightened level of precision. *Colautti v. Franklin*, 439 U.S. 379, 391, 394 (1979) (noting that regulations that threaten abortion rights are held to a higher level of clarity). Indeed, the constitutionally protected right to seek an abortion has been treated with such hostility that abortion providers are uniquely susceptible to being targeted by arbitrary and discriminatory enforcement. *Women's Med. Ctr. of Northwest Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) ("Especially in the context of abortion, a constitutionally protected right that has been a traditional target of hostility, standardless laws and regulations . . . open the door to potentially arbitrary and discriminatory enforcement."). Given the fact that the South Carolina licensing scheme threatens criminal penalties, and in light of the additional fact that constitutionally protected rights are at stake, the provisions of the Regulation must be especially clear as to what is required and what is prohibited.

40

B.

1.

The majority candidly concedes that the "best practices" requirement makes Chapter 10 the "most unclear provision in Regulation 61-12." *Ante* at 16. Under the Best Practices Provisions, a South Carolina abortion provider must comply with "best practices as interpreted by the Department." 24 S.C. Code Ann. Regs. 61-12, Chapter 10 (Cum. Supp. 2001); 24 S.C. Code Ann. Regs. 61-12, § 103(C) (Cum. Supp. 2001). Despite recognizing that the Best Practices Provisions lack clarity, the majority fails to subject them to a vagueness analysis. The proper answers to two questions dispose of the issue: Would a person of reasonable intelligence understand what is required by the Best Practices Provisions? The answer is "No." Is the language of these Provisions so standardless that it enables arbitrary and discriminatory enforcement? The answer is "Yes."

The majority seems to rely, inappropriately, on a reading of the Regulation "in its entirety" in deciding to uphold the Best Practices Provisions. *Ante* at 15. The Supreme Court, however, has recently demonstrated that overbreadth and vagueness analyses are to be conducted on a provision-by-provision basis. *See Ashcroft v. Free Speech Coalition*, 534 U.S. ___, 122 S. Ct. 1389, 1405-06 (2002) (analyzing different provisions of the Child Pornography Prevention Act separately and concluding that only certain subsections violated the First Amendment). Standing alone, the Best Practices Provisions contained in Chapter 10 and § 103 of the Regulation offer no guidance on the scope of their coverage, and they are therefore unconstitutionally vague.

2.

The And/Or Provision found in § 305(A) of the Regulation, as the majority acknowledges, is also "inherently ambiguous." *Ante* at 12. This Provision requires that "[a]ll staff *and/or* consulting physicians shall have admitting privileges at one or more local hospitals." 24 S.C. Code Ann. Regs. 61-12, § 305(A) (Cum. Supp. 2001) (emphasis added). Because of the "and/or" connector, abortion providers in South Carolina, who are subject to criminal sanctions if they violate

41

the Regulation, lack sufficient notice as to what is required of them. *Cf. United States v. Bush*, 70 F.3d 557, 562 (10th Cir. 1995) (discussing the inherent vagueness of an indictment with an "and/or" connector). On the one hand, the And/Or Provision might require all staff physicians and all consulting physicians to have admitting privileges

at local hospitals. On the other hand, it might require either all staff physicians or all consulting physicians to have admitting privileges. To add to the confusion, the word "staff" in this Provision could be functioning either as a noun or as an adjective. If it is a noun, it is possible to read the And/Or Provision to require that the receptionist, at every abortion clinic in the State, possess admitting privileges.

### 3.

In sum, neither the Best Practices Provisions nor the And/Or Provision set forth a sufficiently ascertainable standard of conduct to provide the abortion providers in South Carolina with proper notice of their scope. Therefore, we should hold each of these Provisions to be unconstitutionally vague.

### IV.

Finally, the majority errs in ruling that the Regulation's delegation of decisionmaking authority over abortion licensing complies with due process requirements. Several parts of the Regulation give private parties authority over the licensing of abortion providers in South Carolina. These provisions include: § 205(C)(2),[20]

---

[20] Section 205(C)(2) of the Regulation provides:

> The facility shall enter into a signed written agreement with at least one physician board-certified in obstetrics and gynecology (if not one on staff) who has admitting privileges at one or more local hospitals with OB/GYN services to ensure his/her availability to the staff and patients during all operating hours.

24 S.C. Code Ann. Regs. 61-12, § 205(C)(2) (Cum. Supp. 2001).

§ 305(A),[21] and § 309(B)[22] (collectively, the "Hospital Privilege Provisions"), as well as the Consultation Provision. Because these Provisions give private parties unguided power to refuse to affiliate with abortion clinics, they should be recognized as unconstitutional delegations of government licensing authority.

Because the licensing scheme spelled out in the Regulation threatens to deprive abortion providers in South Carolina of a protected property interest and to burden the liberty interest of women seeking abortions, it must comport with due process. The Due Process Clause requires licensing decisions to be based upon established standards, rather than upon the whim or caprice of the licensor. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also GE Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1454-55 (2nd Cir. 1991); *Hornsby v. Allen*, 326 F.2d 605, 608 (5th Cir. 1964). And if a state decides to delegate part of its licensing authority to a third party, that authority must be exercised in a manner that is consistent with due process requirements. *Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153, 1158-59 (E.D.N.C. 1974) (three-judge panel), *aff'd in part on other grounds*, 519 F.2d 1315 (4th Cir. 1975).

The Plaintiffs maintain that several provisions of the Regulation constitute an improper delegation, without sufficient standards, of the State's licensing authority. Specifically, the Plaintiffs challenge the mandate of the Hospital Privilege Provisions that physicians (and/or others) possess admitting privileges at local hospitals, and they challenge the Consultation Provision's referral arrangement requirement. The Plaintiffs maintain that these provisions grant hospitals and medical specialists, as well as members of the clergy, an effective "veto power" over the licensing of abortion providers. The State, on the other hand, does not contend that the Regulation provides any stan-

---

[21] I have previously designated § 305(A) of the Regulation as the "And/Or Provision." *See supra* Part III. It is also one of the Hospital Privilege Provisions implicated in the improper delegation challenge to the Regulation's hospital admitting privilege requirements.

[22] Section 309(B) of the Regulation provides: "Physicians shall have admitting privileges at one or more local hospitals that have appropriate obstetrical/gynecological services." 24 S.C. Code Ann. Regs. 61-12, § 309(B) (Cum. Supp. 2001).

dards or guidelines for when, or under what circumstances, third parties may refuse to affiliate with abortion providers. It relies, instead, on the irrelevant fact that such providers have not yet had difficulty obtaining licenses.

In rejecting the Plaintiffs' delegation challenges, it is striking that the majority fails to address two contrary decisions directly on point. Indeed, a three-judge district court in this Circuit concluded that a state may not constitutionally delegate to hospitals the unbridled control over abortion licensing by conditioning a license on hospital admitting privileges. In *Hallmark Clinic*, Judge J. Braxton Craven, Jr., then a distinguished member of this Court from North Carolina, addressed the very question we face today, and the majority takes issue with his reasoning without mentioning his considered opinion.[23] In that case, Hallmark Clinic challenged a North Carolina licensing scheme that required abortion providers to have transfer agreements with local hospitals. 380 F. Supp. at 1156. Because the challenged North Carolina regulation did not limit the discretion of hospitals to decide whether to grant such privileges, the court held that the regulation constituted an unconstitutional delegation. As Judge Craven concluded, "the state cannot confer upon a private institution the exercise of arbitrary and capricious power." *Id.* at 1159. If a state requires that physicians have admitting privileges in hospitals in order to obtain licenses to perform abortions, "it must establish and enforce standards for admission to hospital staff privileges." *Id.* Here, South Carolina, like North Carolina in the 1970s, has "given hospitals the arbitrary power to veto the performance of abortions for any reason or no reason at all. The state cannot grant hospitals power it does not have itself." *Id.* at 1158-59.

In *Birth Control Centers, Inc. v. Reizen*, 508 F. Supp. 1366 (E.D.

---

[23] The *Hallmark Clinic* panel was convened pursuant to a statute, since repealed, that required a special three-judge court to hear and decide claims seeking to enjoin the enforcement of a state statute on constitutional grounds. *See* 28 U.S.C. § 2281 (repealed 1976). While *Hallmark Clinic* may not constitute binding authority in our Circuit, Judge Craven's well-reasoned opinion, in the absence of other controlling precedent, should be considered persuasive authority and accorded great weight.

Mich. 1981), *aff'd in part and vacated in part on other grounds*, 743 F.2d 352 (6th Cir. 1984), a district court in Michigan invalidated a regulation similar to the North Carolina licensing scheme at issue in *Hallmark Clinic*. There, Michigan had promulgated a regulation requiring abortion providers to obtain transfer agreements with local hospitals before they could obtain a license. *Id.* at 1369. Relying on the *Hallmark Clinic* decision, the court struck down the Michigan regulation as an impermissible delegation of state power. *See id.* at 1374 (holding that hospital privilege requirements "violate due process concepts because they delegate a licensing function to private entities without standards to guide their discretion"); *see also GE Co. v. N.Y. State Dep't of Labor*, 936 F.2d at 1455 ("[A] legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion.").

Because the Hospital Privilege Provisions of the Regulation delegate the unfettered power to control the licensing of abortion providers, they violate the Due Process Clause. *See Danforth*, 428 U.S. at 74 ("[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding consent."). In addition to other constitutional infirmities, the Hospital Privilege Provisions and the Consultation Provision (for the same reasons that apply to the Hospital Privilege Provisions) constitute standardless delegations of state power. As such, they violate the Due Process Clause and should be invalidated.

## V.

In sum, the majority has misapprehended the underlying facts and misapplied the applicable law in upholding the Regulation in its entirety. Under an appropriate construction of the Regulation and an application of controlling legal principles, several of its provisions are unconstitutional. In particular, the Disclosure Provision violates the right to informational privacy; the Consultation Provision contravenes the Establishment Clause (as well as the Due Process Clause in improperly delegating state licensing authority); the And/Or Provision

and the Best Practices Provisions are unconstitutionally vague; and the Hospital Privilege Provisions violate due process by unconstitutionally delegating state licensing authority.

Because the majority refuses to recognize these constitutional infirmities, I respectfully dissent.