Affirmed by published opinion. Judge MICHAEL wrote the majority opinion, in which Judge MOTZ joined. Judge NIEMEYER wrote a dissenting opinion.
*131 OPINION
MICHAEL, Circuit Judge:
We reconsider the constitutionality of a Virginia statute that outlaws what is termed “partial birth infanticide.” Va. Code Ann. § 18.2-71.1 (the Virginia Act or the Act). Reconsideration is required in light of Gonzales v. Carhart (Carhart II), 550 U.S. -, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), which rejected a facial challenge to the federal partial birth abortion statute prohibiting the intact dilation and evacuation (D & E) procedure. Critical to the Court’s holding in Carhart II is the federal statute’s requirement that a doctor intend at the outset to perform an intact D & E; according to the Court, this requirement of intent at the outset ensures that the federal statute does not impose criminal liability on a doctor who sets out to perform a standard D & E that by accident becomes an intact D & E. As a consequence, the federal statute does not prohibit — through fear of criminal liability — doctors from performing the standard D & E procedure, the procedure employed in the vast majority of (previability) second trimester abortions. In contrast, the Virginia Act has no provision requiring intent at the outset of the procedure. The Virginia Act thus imposes criminal liability on a doctor who sets out to perform a standard D & E that by accident becomes an intact D & E, thereby exposing all doctors who perform standard D & Es to prosecution, conviction, and imprisonment.
The dissent argues unconvincingly that the Virginia Act is constitutional because, “properly read,” it has the same requirement of intent at the outset as the federal statute. See post at 157. The dissent fails to accept that the Virginia Act plainly delays the application of its intent requirement until the fetus has been “substantially expelled or extracted” intact. See Va. Code Ann. § 18.2-71.1.C. After that point, as the doctor takes any intentional step in completing the procedure that results in termination of the fetus, he commits the crime of “partial birth infanticide.” He commits the crime even if he intended at the outset to perform a (lawful) standard D & E, and thus the fetus was substantially expelled or extracted intact by accident. Such a statute cannot stand under Carhart II, which requires as a prerequisite for criminal liability that a doctor intend at the outset to perform an intact D & E.
The Virginia Act is therefore unconstitutional because it imposes an undue burden on a woman’s right to obtain an abortion. The district court’s summary judgment, to the extent it declared the statute invalid on this ground, is affirmed.
I.
A.
Under the Virginia Act, passed in 2003, “[a]ny person who knowingly performs partial birth infanticide ... is guilty of a Class 4 felony.” Va.Code Ann. § 18.2-71.1. A class 4 felony in Virginia is punishable by a prison term of up to ten years and a fíne of up to $100,000. Id. § 18.2-10. The Act defines “partial birth infanticide” as
any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.
Id. § 18.2-71.1.B. A “human infant who has been born alive” is defined as
a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, *132 which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.
Id. § 18.2-71.1.C. Finally, “ ‘substantially expelled or extracted from the mother’ means in the case of a headfirst presentation, the infant’s entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant’s trunk past the navel is outside the body of the mother.” Id. § 18.2-71.1.D. (We refer to the positions of the fetus described in this definition as “anatomical landmarks.”)
The Virginia Act excludes certain procedures from the definition of “partial birth infanticide,” including (1) “the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother,” and (2) “completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.” Id. § 18.2-71.1.B. The Act does not include an exception to preserve a woman’s health. It does have a life — or “prevention of] death” — exception:
This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant. A procedure shall not be deemed necessary to prevent the death of the mother if completing the delivery of the living infant would prevent the death of the mother.
Id. § 18.2-71.1.E.
Plaintiff William G. Fitzhugh, M.D., is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs previ-ability abortions through twenty weeks of pregnancy. He performs some abortions on the premises of plaintiff Richmond Medical Center for Women (RMCW) where he is Medical Director. Dr. Fitz-hugh uses several different abortion techniques in his practice. For second trimester abortions, he usually employs the dilation and evacuation (D & E) method. Dr. Fitzhugh asserts that the Act exposes a doctor to criminal liability every time he attempts a D & E abortion, because this procedure always poses the risk of unintentional intact delivery of the fetus to one of the anatomical landmarks specified in the Act.
Shortly before the Act’s July 1, 2003, effective date, RMCW and Dr. Fitzhugh sued two Commonwealth Attorneys (the Commonwealth) in district court, challenging the Virginia Act as unconstitutional on its face and seeking to enjoin its enforcement. Ultimately, the district court granted the plaintiffs summary judgment and a permanent injunction. The court concluded that the Act was unconstitutional for five independent reasons: (1) the Act lacks an exception to protect a woman’s health; (2) it imposes an undue burden on a woman’s right to choose an abortion because “[t]he plain language of the Act bans pre-viability D & Es and would cause those who perform such D & Es to fear prosecution, conviction and imprisonment”; (3) its exception to protect a woman’s life is inadequate; (4) it bans the safe completion of miscarriages; and (5) it is unconstitutionally vague. See Richmond Med. Ctr. for Women v. Hicks, 301 F.Supp.2d 499, 513-17 (E.D.Va.2004).
The Commonwealth appealed to this court, and we (by a divided panel) affirmed the district court on the ground that the Act lacked an exception to protect a worn- *133 an’s health. Richmond Med. Ctr. for Women v. Hicks, 409 F.3d 619 (4th Cir.2005). The petition for rehearing en banc was denied. Richmond Med. Ctr. for Women v. Hicks, 422 F.3d 160 (4th Cir.2005). The Supreme Court later granted certiorari, vacated our judgment, and remanded for further consideration in light of its recent decision in Gonzales v. Carhart, 550 U.S. -, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Herring v. Richmond Med. Ctr. for Women, — U.S. -, 127 S.Ct. 2094, 167 L.Ed.2d 810 (2007).
B.
The range of abortion procedures have been extensively described in several Supreme Court opinions. See, e.g., Carhart II, 127 S.Ct. at 1620-23; Stenberg v. Carhart (Carhart I), 530 U.S. 914, 923-29, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Here, we briefly describe only those procedures that are relevant to the plaintiffs’ challenge to the Virginia Act. The descriptions are based on undisputed evidence in the summary judgment record, taking into account, except where noted, evidence excluded by the district court. The descriptions are also consistent with those set forth in Carhart I and Carhart II.
D & E (dilation and evacuation) is by far the most common method of previability second trimester abortion, used approximately ninety-five percent of the time. In this procedure the doctor dilates the woman’s cervix and uses suction and forceps to remove the fetus. The doctor also uses instruments to hold the vagina open and to gain access to the cervix and uterus. As the doctor uses forceps to pull the fetus out of the cervix during a D & E, friction usually causes parts of the fetus to break off or disarticulate. See Carhart II, 127 S.Ct. at 1621; Carhart I, 530 U.S. at 925-26. As a result of disarticulation the fetus is removed in pieces. Throughout the process, the fetus may show signs of life, such as a heartbeat, although disarticulation ultimately causes fetal demise.
A variation of the standard D & E procedure, termed “intact D & E” or “dilation and extraction” (D & X), occurs when the doctor removes the fetus intact or largely intact. Carhart II, 127 S.Ct. at 1621-23; Carhart I, 530 U.S. at 927-29. Because “[t]he medical community has not reached unanimity on the appropriate name for this D & E variation,” we will refer to it as “intact D & E,” as does the Supreme Court. Carhart II, 127 S.Ct. at 1621. A doctor intending to perform an intact D & E uses certain methods, such as serially dilating the cervix or rotating the fetus as it is pulled out of the uterus, to increase the likelihood of intact delivery. See Carhart II, 127 S.Ct. at 1621-22. In an intact D & E, as generally described, the fetal skull is typically too large to pass through the cervix, and the doctor compresses or collapses the skull to complete the abortion. See Carhart II, 127 S.Ct. at 1622-23; Carhart I, 530 U.S. at 925, 927.
As the Supreme Court has recognized and the Commonwealth does not dispute, in a small fraction of cases a doctor performing a standard D & E procedure unintentionally (or accidentally) delivers a fetus intact or substantially intact. See Appellants’ Supplemental Reply Br. 6 (Commonwealth stating that “an accidental intact D & E occurs ‘in a small fraction of the overall number of D & E abortions’ ” (quoting Carhart II, 127 S.Ct. at 1632) (emphasis added by Commonwealth)); see also Carhart I, 530 U.S. at 925-26, 120 S.Ct. 2597. The potential for an accidental intact delivery of a fetus to an anatomical landmark during a standard D & E is grounded on two undisputed factual premises. First, it is possible for a doctor to remove a fetus to an anatomical landmark during a D & E. See Carhart II, 127 S.Ct. *134 at 1629 (stating that in an intact D & E “a doctor delivers the fetus until its head lodges in the cervix, which is usually past the anatomical landmark for a breech presentation”). Second, doctors are unable to predict at the outset of the standard D & E procedure when, or even whether, a fetus will disarticulate during evacuation. As Dr. Fitzhugh and experts for both sides in this case explained, several factors beyond the doctor’s control influence fetal disarticulation, including the precise level of cervical dilation, the condition of the uterus and the cervix, the size and orientation of the fetus, and fetal fragility. While the fetus usually disarticu-lates as it is pulled through the cervix, on occasion the factors just noted may cause it to emerge intact or substantially intact. Dr. Fitzhugh does not intentionally perform intact D & Es; however, when he performs standard D & Es, a small fraction of those cases result in intact or substantially intact extraction of the fetus pri- or to completion of the abortion.
Once a fetus emerges to an anatomical landmark despite the doctor’s intent to perform a standard D & E, steps must be taken to complete the abortion. Thus, in a breech presentation, after the fetus reaches or passes the navel (an anatomical landmark), the doctor will continue to pull to extract the fetus. This force and traction usually causes the fetus to disarti-culate, leading to its demise. In addition, the fetal skull can become lodged in the cervix, as it would in an intentional intact D & E. In this situation the doctor will have to compress or collapse the fetal skull to remove it through the cervix and complete the abortion, another act that causes fetal demise.[1]
*135 II.
We now proceed to reconsider the summary judgment rendered by the district court in favor of RMCW and Dr. Fitzhugh. We review the grant of summary judgment de novo. See Long v. Dunlop Sports Group Ams., Inc., 506 F.3d 299, 301 (4th Cir.2007). Summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c).
Our reconsideration is undertaken in light of Carhart II, as the Supreme Court has instructed. In Carhart II the Court considered the constitutional limits on the regulation of abortion procedures and held that the federal Partial-Birth Abortion Ban Act of 2003 (the Federal Act), 18 U.S.C. § 1531, is, “as a facial matter,” constitutional. 127 S.Ct. at 1639. The Court began its analysis by quoting the summary of governing principles set forth in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992):
“It must be stated at the outset and with clarity that [the] essential holding [of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)], the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State’s interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman’s effective right to elect the procedure. Second is a confirmation of the State’s power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman’s life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.”
Carhart II, 127 S.Ct. at 1626 (quoting Casey, 505 U.S. at 846, 112 S.Ct. 2791 (opinion of the Court)). In Carhart II the Court also adhered to Carhart J’s central holding: a law that effectively prohibits “[standard] D & E procedures, the most commonly used method for performing previability second trimester abortions,” imposes “an undue burden upon a woman’s right to make an abortion decision,” in violation of the Constitution. Carhart I, 530 U.S. at 945-46, 120 S.Ct. 2597; see Carhart II, 127 S.Ct. at 1619, 1629-31.
After reviewing the text of the Federal Act, the Carhart II Court concluded that the Federal Act “prohibits a doctor from intentionally performing an intact D & E,” but “does not prohibit the [standard] D & E procedure in which the fetus is removed in parts.” Carhart II, 127 S.Ct. at 1629. The Court’s constitutional analysis proceeded as follows. First, the Court considered whether the Federal Act was void for vagueness or overly broad. Here, the Court was guided by the Federal Act’s “definition of] the unlawful abortion in explicit terms.” Id. at 1627. Specifically, *136 to violate the Federal Act, a doctor must (1) vaginally deliver a living fetus; (2) deliver the fetus to a clearly described anatomical landmark; and (3) “perform an ‘overt act, other than completion of delivery, that kills the partially delivered living fetus,’ ” id. at 1627 (quoting 18 U.S.C. § 1531(b)(1)(B)). Id. at 1627-28. Further, the Court emphasized that the Federal Act contains intent requirements “concerning all the actions involved in the prohibited abortion.” Id. at 1628. Thus, the Federal Act requires that the doctor (1) “deliberately and intentionally” deliver the fetus to a specific anatomical landmark (2) “for the purpose of performing an overt act that the [doctor] knows will kill [it].” Carhart II, 127 S.Ct. at 1628 (quoting 18 U.S.C. § 1531(b)(1)(A)) (alteration in original). Through this precise definition the Federal Act makes it a crime for a doctor to intentionally set out to perform and then to perform an intact D & E abortion.
In rejecting the vagueness challenge, the Court concluded that the Federal Act’s intent requirements provide doctors with a clear description of the prohibited conduct and prosecutors with objective criteria that serve to limit their discretion. 127 S.Ct. at 1628-29. The Court then concluded that the Federal Act was not overly broad because it only “prohibits a doctor from intentionally performing an intact D & E.” Id. at 1629. Again, the Court found that the Federal Act’s reach was limited by the features of the unlawful abortion enumerated above. Id. at 1629-32. Specifically, the “intent requirements ... preclude liability from attaching to an accidental intact D & E.” Id. at 1631. Thus, a doctor does not run the risk of violating the Federal Act when he sets out to perform a standard D & E, even though the fetus might be delivered to one of the anatomical landmarks “by accident or inadvertence.” Id. at 1628. As a result, the scope of the Federal Act is carefully limited to prohibit intentional intact D & E, thereby allowing access to the more widely used standard D & E procedure. Id. at 1629-32.
Second, the Court considered whether the Federal Act was passed with the impermissible purpose of placing “ ‘a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.’ ” Id. at 1632 (quoting Casey, 505 U.S. at 878, 112 S.Ct. 2791 (plurality opinion)). The Court determined that Congress, in carefully targeting its restriction to the intact D & E, was engaging in a legitimate use of its authority to “regu-lare] the medical profession in order to promote respect for life, including life of the unborn.” Id. at 1633.
Third, the Court considered whether the Federal Act imposed a substantial obstacle to late-term, previability abortions by failing to include an exception to preserve the health of the woman. Id. at 1635-38. The Federal Act contains a life exception, 18 U.S.C. § 1531(a), but not a health exception. The Court noted that “whether the Act creates significant health risks for women [was] a contested factual question.” Id. at 1635. As a result, the Court held, “[t]he [Federal] Act is not invalid on its face [because] there is uncertainty over whether the barred procedure is ever necessary to preserve a woman’s health, given the availability of other abortion procedures,” such as the standard D & E, “that are considered to be safe alternatives.” Id. at 1638. In the face of this medical uncertainty, only as-applied challenges to the Federal Act’s lack of a health exception may be pursued. Id. at 1638-39.
With this overview of Carhart II in mind, we turn to the parties’ arguments with respect to whether the Virginia Act is constitutional in light of that decision and whether a facial challenge is appropriate here.
*137 III.
RMCW argues, and the district court held, that the Virginia Act creates an undue burden on a woman’s constitutional right to choose an abortion in the second trimester, prior to fetal viability, because the Act effectively prohibits the standard D & E procedure. See Richmond Med. Ctr. for Women, 301 F.Supp.2d at 515. The Commonwealth responds that summary judgment cannot be affirmed on this ground because “[t]he Virginia Act is substantively identical to the federal statute upheld in [Carhart II].” Appellants’ Supplemental Br. 12. We disagree with the Commonwealth. The Virginia Act lacks the intent and distinct overt act requirements that were central to the Supreme Court’s decision to uphold the Federal Act in Carhart II. Unlike the Federal Act, the Virginia Act subjects all doctors who perform standard D & Es to potential criminal liability, thereby imposing an unconstitutional burden on a woman’s right to choose a previability second trimester abortion.
A.
The Virginia Act criminalizes “partial birth infanticide,” a new term. Va.Code Ann. § 18.2-71.1.A. This crime occurs when (1) a fetus “has been ... substantially expelled or extracted from its mother” (that is, has emerged to an anatomical landmark) while exhibiting “evidence of life,” (2) thereafter, but before the fetus is “completely extracted or expelled,” a person “knowingly performs” “any deliberate act that ... is intended to kill” the fetus, and (3) the deliberate act “does kill” the fetus, “regardless of whether death occurs before or after extraction or expulsion.” Va.Code Ann. § 18.2-71.1.A-D.
Like the Federal Act, the Virginia Act specifies anatomical landmarks (the fetal head or the trunk past the navel must be “outside the body of the mother”) that establish the point at which the Act applies.[2] Id. § 18.2-71.1.D; 18 U.S.C. § 1531(b)(1)(A). Apart from this similarity, the two statutes have key differences.
First, the Federal Act “contains scienter requirements concerning all the actions involved in the prohibited abortion,” including both a requirement that the doctor intentionally deliver the fetus to an anatomical landmark and a requirement that this delivery be for the purpose of performing the overt act that the doctor knows will cause fetal demise. Carhart II, 127 S.Ct. at 1628; see 18 U.S.C. § 1531(b)(1)(A). As the Supreme Court observed, under the Federal Act “[i]f either intent is absent, no crime has occurred.” Carhart II, 127 S.Ct. at 1628. These intent requirements were crucial to Carhart IFs holding that the Federal Act does not prohibit standard D & E and is thus constitutional. Id. at 1629. In evaluating the overbreadth challenge, the Court explained the significance of the intent requirements: “The Act’s intent requirements ... limit its reach to those physicians who carry out the intact D & E after intending to undertake both [the delivery to an anatomical landmark and the distinct overt act] steps at the outset.” Id. The Court rejected the respondents’ argument that the Federal Act imposes criminal liability on doctors who complete an abortion after accidental intact delivery to an anatomical landmark. According to the Court, this argument failed to “take account of the Act’s intent requirements, which preclude liability from attaching to an accidental intact D & E.” Id. at 1631.
The Virginia Act lacks any such protection. Instead, the Act’s only intent re *138 quirement relates to the overt act: the doctor is prohibited from “knowingly perform[ing] ... any deliberate act that ... is intended to kill [and does kill] a human infant who has been born alive, but who has not been completely extracted or expelled from its mother.” Va.Code Ann. § 18.2-71.1.A, B. In contrast to the Federal Act, the Virginia Act omits any mention of the doctor’s intent at the commencement of the procedure, using the phrase “has been born alive” to describe delivery. Va.Code Ann. § 18.2-71.1.B (emphasis added). Compare 18 U.S.C. § 1531(b)(1)(A) (requiring that the doctor “deliberately and intentionally vaginally deliver[ ] a living fetus,” thus focusing on intent at the outset). The Virginia Act’s use of the passive voice in “has been born alive” makes it clear that the statute does not require that the doctor intend at the outset to perform an intact D & E for a violation to occur.
The Virginia Act’s requirement that a doctor “knowingly perform[ ] partial birth infanticide” does not remedy the problem. The term “partial birth infanticide” has a specific definition: to perform “any deliberate act that ... is intended to kill a human infant who has been born alive.” Va.Code Ann. § 18.2-71.1.B. The use of “has been born alive,” which describes an event that has already occurred, means that partial birth infanticide, as defined by the Act, does not occur until after delivery to an anatomical landmark, at the point the doctor commits the deliberate act. See post at 157-58. The knowledge requirement thus only attaches to commission of the deliberate act (that is, the commission of the partial birth infanticide); the knowledge requirement does not attach to the commencement of the abortion. In sum, the Virginia Act reaches doctors who intend to perform a standard D & E, but who nonetheless accidentally deliver the fetus to an anatomical landmark, and who must perform a deliberate act that causes fetal demise in order to complete removal.
Second, the Virginia Act differs from the Federal Act because, although both statutes require that the doctor perform a deliberate act to cause fetal demise after delivery to an anatomical landmark, the Federal Act requires that this act be distinct from completing delivery. The Virginia Act lacks such a distinction. Compare Va.Code Ann. § 18.2-71.1.B (requiring “any deliberate act”) with 18 U.S.C. § 1531(b)(1)(B) (requiring an “overt act, other than the completion of delivery”). “This distinction matters because, unlike intact D & E, standard D & E does not involve a delivery followed by a fatal act.” Carhart II, 127 S.Ct. at 1631. The Federal Act’s requirement of an overt act distinct from completion of delivery excludes standard D & Es in which fetal demise results from disarticulation that occurs during the delivery. The Federal Act, in other words, requires an additional act such as compressing the fetal skull before liability can attach. In contrast, a doctor is liable under the Virginia Act for completing the evacuation of a fetus after it has emerged substantially intact if disarti-culation (causing fetal demise) occurs during this process. See Carhart I, 530 U.S. at 939, 943-44, 120 S.Ct. 2597 (striking down abortion ban because it failed to distinguish between delivery and the act that terminated the fetus).
Notwithstanding the dissent’s contention, the Virginia Act’s requirement that a doctor “intend [] to kill a human infant” does not save a doctor from liability when the completion of delivery causes fetal demise. Post at 158 (quoting Va.Code Ann. § 18.2-71.1.B). “[Fjntent to cause a result may sometimes be inferred if a person ‘knows that that result is practically certain to follow from his conduct.’ ” Carhart *139 II, 127 S.Ct. at 1632 (quoting 1 LaFave § 5.2(a), at 341). Because the record establishes that completing delivery after removal to an anatomical landmark usually results in fetal demise, intent would be inferred onto the doctor when this event occurs. The doctor would thus violate the Virginia Act.
The absence of the intent and distinct overt act requirements in the Virginia Act expand its reach substantially beyond that of the Federal Act. Every time a doctor intends at the outset to perform a standard D & E, he runs the real risk of accidentally delivering an intact fetus to an anatomical landmark. As the Supreme Court recognizes, and the record in this case confirms, an accidental intact D & E occurs “in a small fraction of the overall number of D & E abortions.” Carhart II, 121 S.Ct. at 1632. The Virginia Act imposes criminal liability in all such cases because a doctor faced with an accidental intact D & E must take steps to complete the abortion. He completes the abortion, in the case of a breech presentation, by continuing to pull (or apply traction) to extract the fetus, which usually causes disarticulation and fetal demise. In addition, as traction is applied, the fetal skull may become lodged in the cervix; in that case the doctor compresses the skull, which also causes fetal demise. The Virginia Act imposes criminal liability for either of these acts that terminate the fetus, and it does so even though the doctor intended at the outset to perform the standard D & E procedure.
B.
The dissent argues that three exceptions in the Virginia Act protect doctors who perform standard D & Es even if accidental intact delivery results, thereby rendering the Act constitutional. An examination of the exceptions reveals, however, that they do not save the Act.
First, the dissent suggests that “the Virginia Act’s explicit exemption of [the standard D & E] procedure provides the same protection as the Federal Act’s scienter requirement,” which eliminates liability for doctors performing standard D & Es. Post at 155. But the dissent fails to recognize that the Virginia Act provides a definition of the conduct the D & E exception covers: “the [D & E] abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother.” Va. Code Ann. § 18.2—71.1. B (iii) (emphasis added). This definition, which only covers the D & E procedure in this limited circumstance, does not provide a safe harbor for doctors who face accidental intact D & Es.
As an initial matter, the exception only applies to the act of dismemberment.[3] The exception would never cover the situation where a doctor accidentally delivers a fetus to an anatomical landmark and the fetal skull becomes lodged in the cervix, forcing the doctor to compress the skull to complete the abortion. Liability would always attach in this circumstance, effectively prohibiting doctors from performing standard D & Es.
Furthermore, the Act’s D & E exception would not protect a doctor when the fetus accidentally emerges to an anatomical landmark and the fetus disarticulates as the doctor completes delivery. Again, the exception covers a D & E “involving dismemberment of the fetus prior to removal from the body of the mother.” Id. § 18.2-71.1.B (emphasis added). The Act does not define the word “removal,” but its standard dictionary definition is “the act or *140 process of removing: the fact of being removed.” Merriam-Webster’s Collegiate Dictionary 1053 (11th ed.2003). With the meaning of “removal” taken into account, the exception applies only to a “[D & E] procedure involving dismemberment of the fetus prior to [the process of removing it] from the body of the mother.” Va.Code Ann. § 18.2-71.1.B.
The process of removing the fetus from the body of the mother begins when the doctor extracts any portion of the fetus through the vaginal opening. Thus, the exception would cover the D & E procedure where the fetus disarticulates before the doctor begins removing it through the vaginal opening. As a result, the Act would not criminalize the typical standard D & E where the doctor evacuates the fetus “piece by piece,” a process that often takes “10 to 15 passes ... to evacuate the fetus in its entirety.” Carhart II, 127 S.Ct. at 1621. But the Virginia Act would still make it a crime when a fetus first disarticulates after it accidentally emerges intact to an anatomical landmark. In that case the fetus would not be dismembered “prior to removal from the body of the mother”; instead, dismemberment would begin after intact removal of the fetus to a landmark. Va.Code Ann. § 18.2-71.1.B (emphasis added). As the Commonwealth stated at oral argument, a doctor “would violate the Virginia Act” if “the child had emerged intact or largely intact ... [and] it is necessary to dismember the child.”
The dissent nonetheless argues that the language in the D & E exception is identical to the language used by the Supreme Court to describe the full range of standard D & Es, and thus the exception excludes all standard D & Es from liability. Post at 156 n. 1. The dissent is mistaken. The Supreme Court describes standard D & E, which is not prohibited by the Federal Act, as a procedure “in which the fetus is removed in parts.” Carhart II, 127 S.Ct. at 1629. The Court’s description encompasses D & Es in which disarticulation occurs either before or after the fetus reaches an anatomical landmark. In contrast, the Virginia Act limits its exception to D & Es in which disarticulation occurs “prior to removal” to an anatomical landmark. Va.Code Ann. § 18.2-71.1.B. Thus, the D & E exception does not protect from liability a doctor who accidentally delivers a fetus to an anatomical landmark and thereafter completes delivery that results in disarticulation and fetal demise.
Second, the dissent and the Commonwealth argue that the Virginia Act’s life exception, Va.Code Ann. § 18.2-71.1.E, sufficiently limits liability because a woman’s life might be endangered if the fetal skull becomes caught in her cervix. In that case, the argument goes, the doctor would be allowed to compress the fetal skull to save the woman’s life under the Act. This argument does not solve the over-breadth problem because it is based on a misunderstanding of the scope of the life exception. Applying the life exception in the manner suggested would render the Virginia Act largely meaningless by permitting the very procedure the Act was meant to prohibit: an intact D & E where, after a substantially intact delivery, the doctor must compress the fetal skull to remove the fetus. In other words, because the Act’s prohibition does not apply until after delivery to an anatomical landmark, a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act’s prohibition and its life exception would begin to apply; and the life exception would immediately cancel out the prohibition, allowing the doctor to deliberately collapse the skull to complete the abortion. This simply cannot be the purpose of the exception.
*141 The dissent argues that the life exception would not cancel out the prohibition when the fetal skull becomes lodged. Post at 162. The dissent initially contends that the Act implicitly requires that a doctor must intend to deliver the fetus intact “from the commencement of the procedure.” Post at 161. According to the dissent, the life exception thus “cannot prevent criminal liability from attaching” to a doctor performing a prohibited abortion: the doctor would necessarily intend to perform an intact D & E from the outset, which conflicts with the exception’s requirement that the doctor work to preserve the life of the fetus. Id. at 162. This argument fails because, as we have explained, the Act’s intent requirement only attaches after the fetus has been delivered to an anatomical landmark, so it does not distinguish between doctors who intend at the outset to perform standard D & Es and those who intend at the outset to perform intact D & Es. See supra 137-38; see also infra at 142-43. Because the Act does not make this distinction, the life exception applies to both sets of doctors; and, under the dissent’s interpretation, the exception would eliminate liability for all doctors who must collapse the fetal skull, thereby undermining the Act’s prohibition. The dissent next argues that collapse of the fetal skull would only be permitted if the doctor first “makes reasonable efforts — whatever those encompass — to preserve the health and life of the fetus.” Post at 162. But the record establishes that when the fetal skull becomes lodged in the cervix, the doctor must collapse the skull to complete the procedure.[4] Because such a step is an essential part of the typical intact D & E, the life exception— applied as the dissent suggests — would exempt the intact D & E, thereby undermining the Act’s prohibition. Finally, neither the Commonwealth nor the dissent contend that the life exception would apply when a doctor’s completion of delivery results in disarticulation after the fetus accidentally reaches an anatomical landmark.
Third, the dissent argues that the exception for “completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered,” Va.Code Ann. § 18.2-71.1.B(iv), makes it unnecessary for the Act to include a distinct overt act requirement. Under this exception, according to the dissent, a doctor can not be liable for disarticulation that occurs during the delivery process. To begin with, even the dissent does not argue that this exception protects a doctor who must collapse the fetal skull after it becomes lodged in the cervix. Furthermore, this exception’s language does not support the dissent’s reading. The phrase “completing delivery of a living human infant and severing the umbilical cord” indicates that the fetus must be living and intact at the completion of delivery. Thus, an act (such as disarticulation) that causes fetal demise can not occur during delivery for the exception to apply. This conclusion is buttressed by the fact that neither the dissent nor the Commonwealth argue that collapsing the fetal skull would fall under the exception. If the exception only requires that the fetus be living at some point during delivery, rather than at the end of delivery, the exception would cover the situation where the fetus showed signs of life until the doctor collapsed its skull. Under the dissent’s interpretation, collapsing the fetal skull to *142 make extraction through the cervix possible would be an act (like disarticulation) involved in “completing the delivery of a living human infant,” and thus would be covered by the exception.
In addition, the exception in § 18.2-71.1.B(iv) uses the conjunctive “and,” requiring both the completion of delivery of a “living human infant” and the (post-delivery) severing of the umbilical cord. Thus, even if the fetus continues to show signs of life after disarticulating during delivery (thus qualifying as a “living human infant” post-delivery), the exception still would not apply unless the doctor also severs the umbilical cord post-delivery. But according to the record, the umbilical cord often disarticulates during the delivery process, thus rendering it unnecessary for the doctor to sever it at the end of the process as required for the exception to apply. On the other hand, even if the umbilical cord remains attached after delivery, the exception would not apply if the fetus no longer shows signs of life. Of course, the fetus often will expire and its umbilical cord will disarticulate prior to completion of delivery when the extraction process causes disarticulation, thus making the exception doubly inapplicable. The exception’s terms thus reveal a specific purpose: the exception ensures that doctors will not face liability for committing the deliberate act of severing the umbilical cord after completely delivering a living infant. In short, the exception protects obstetricians who deliver living infants, not doctors who perform abortions.
In sum, the exceptions in the Act only protect a doctor in certain limited circumstances, and they do not exempt from liability a doctor performing a standard D & E who accidentally delivers a fetus to an anatomical landmark when the completion of delivery (through disarticulation or collapse of the fetal skull) results in fetal demise.
C.
The dissent makes four additional arguments that also conflict with the plain language of the Virginia Act.
First, the dissent insists that we must read the Act to include an intent requirement to fulfill the Act’s intended purpose. The dissent’s argument is as follows: Carhart II states that “[t]he difference between the intact D & E abortion procedure and the standard D & E abortion procedure depends on the intent and approach of the doctor in commencing the delivery and the degree of dilation sought to be achieved.” Post at 156. Because (according to the dissent) “partial birth infanticide” is simply another name for intact D & E or “partial birth abortion,” we should interpret the Act to prohibit intentional intact delivery in order to fulfill the statutory purpose. Id.; see id. at 149 (describing intact D & E, “partial birth infanticide,” and “partial-birth abortion” as different terms for the same conduct); id. at 154 (declaring that the Act “was intended to prohibit only partial birth abortions”).
The dissent’s central premise in this argument — that partial birth infanticide is the exact equivalent of intact D & E— lacks support in the text of the Act. The dissent claims to find support in the D & E exception, arguing that this exception exempts all standard D & Es from the reach of the Act. See post at 157. As we have explained, however, the D & E exception only exempts some standard D & Es from the Act; it does not protect doctors who are faced with accidental intact delivery of the fetus during a standard D & E. See supra at 139-10. Thus, the terms of the exception do not support the dissent’s conclusion that all standard D & Es are ex *143 empted from the Virginia Act, nor its conclusion that partial birth infanticide is the same procedure as the intact D & E prohibited by the Federal Act. The Virginia legislature chose to create — and then define — an entirely new legal term to describe a crime; this is not a term used by the medical community or the Federal Act. In fact, the Commonwealth explains that partial birth infanticide prohibits conduct other than intact D & E, including, for example, the murder of a partially delivered baby by a parent. Appellants’ Br. 14. We (like the officials who enforce the Act) must look to the language of the statute to determine the legislature’s intent. Our statutory analysis always begins with the statute’s express words; this approach is especially important when, as here, the statute coins a new term. Any ambiguity would, of course, be resolved in favor of constitutionality, but here the Act’s terms are clear. As explained above, the Act criminalizes “knowingly performing] partial birth infanticide,” which it defines as “any deliberate act that is intended to kill the fetus” after it “has been born alive.” The Act thus only imposes an intent requirement after delivery to an anatomical landmark. Under the Act’s terms, the doctor’s “intent at the outset” is simply irrelevant to liability under the Virginia Act. Post at 157 (citing Carhart II, 127 S.Ct. at 1631). Thus, the Virginia Act’s clear terms, which must control our analysis, define partial birth infanticide as different conduct than the intact D & E prohibited by the Federal Act.
Once it is understood that the dissent’s central premise — that the Virginia Act is really intended to criminalize the same conduct as the Federal Act — is foreclosed by the Act’s express terms, the remainder of the dissent’s argument supports our conclusion. As the dissent explains, Carhart II established that “the intent and approach of the doctor in commencing the delivery” is essential in distinguishing intact D & E (which may be prohibited) from standard D & E (which may not). Post at 156. The Act’s express terms do not require that a doctor intend to conduct an intact D & E at the commencement of delivery. See supra at 137-38. Under Carhart II’s determination that intent at commencement is key in distinguishing the two procedures, it is clear that the Virginia Act’s prohibition reaches standard D & Es, making it unconstitutionally broad.
Because the Act does not have an intent requirement for the commencement of the abortion, the dissent’s next contention also fails. The dissent argues that a doctor can never violate the Act when he intends at the outset to perform a standard D & E because at that point “he is not ‘aware that it is practically certain that his conduct will cause [the proscribed] result.’ ” Post at 156 (quoting Model Penal Code § 2.02(2)(b)(ii) and citing Carhart II, 127 S.Ct. at 1631—32). But the “practically certain” test is only relevant to infer intent on the part of the actor once a statute’s intent requirement attaches. The Virginia Act’s intent requirement only attaches to the doctor’s actions after intact delivery to an anatomical landmark. Thus, lack of certainty at the outset is irrelevant to the doctor’s liability. At the point the intent requirement does attach — after delivery to .a landmark — the doctor is practically certain that completing extraction will result in an act causing fetal demise, thus leading to a violation of the Virginia Act. Compare Carhart II, 127 S.Ct. at 1631-32 (describing how, because the Federal Act requires intentional intact delivery, the relative infrequency of accidental intact deliveries precludes the inference of intent and resulting liability onto a doctor beginning a standard D & E).
*144 Third, the dissent argues that the Act constitutionally prohibits a doctor from undertaking a deliberate act after the fetus has been completely removed intact from the woman’s body. Post at 152-53, 159-61. The dissent’s argument is irrelevant to this case. Dr. Fitzhugh and RMCW do not challenge the Act’s constitutionality in the exceedingly rare circumstance when (in a D & E) a fetus is entirely intact after complete removal, the district court did not decide such a claim, and the Commonwealth does not raise any argument against such a claim on appeal. In fact, the Commonwealth contradicts the dissent by recognizing that “[o]n those occasions when Dr. Fitzhugh is able to remove the fetus intact during a D & E abortion procedure, he does not engage in any act to kill the fetus [or violate the Act] once it is removed from the body of the mother.” Appellants’ Br. 23.
Finally, the dissent complains that our analysis “ignorfes] explicit language and undertakes a] course to find ambiguity in the Virginia Act so as to be able to strike it down,” thus “violat[ing] established rules of statutory construction.” Post at 158. But, as we have demonstrated, it is the dissent that ignores the Act’s language and finds ambiguity where none exists. The express terms of the Act are susceptible to only one construction: that doctors performing standard D & Es face liability when the fetus emerges substantially intact and completing extraction causes fetal demise. Because the Act does not suffer from ambiguity, it cannot be remedied through the application of the rule of lenity or the cannon of constitutional avoidance. See Carhart II, 127 S.Ct. at 1631 (“[T]he cannon of constitutional avoidance does not apply if a statute is not ‘genuinely susceptible to two constructions.’ ” (quoting Almendarez-Torres v. United States, 523 U.S. 224, 238, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998))); see also Ratzlaf v. United States, 510 U.S. 135, 148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (“[W]ere we to find [the statute] ambiguous ... we would resolve any doubt in favor of the defendant.”). Further, the presumption of scienter only applies when a criminal statute lacks any intent requirement. See Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)(applying presumption when the statute is “silent concerning the mens rea required for a violation”). Here, the Act includes an intent requirement, which criminalizes intentionally performing an act to cause fetal demise at a specific point in delivery. We may not ignore the legislature’s deliberate choices and impute an additional intent requirement into the Act, thereby creating a entirely new element&emdash; the intentional commencement of an intact D & E&emdash;for the crime of “partial birth infanticide.”
In its attempt to force the Virginia Act into constitutional bounds, the dissent strays far from the text. The dissent declares&emdash;without a discernible basis&emdash;that the Virginia legislature intended to prohibit intact D & E, just as the Federal Act does. The dissent then proceeds to make exceedingly complicated arguments that do not come to grips with the plain language of the Virginia Act. In the end, the dissent fails in its effort to square the Virginia and the Federal Acts. For there is no argument that can obfuscate the simple fact that the Virginia Act employs different language than the Federal Act, thereby prohibiting different conduct. The Virginia Act, on its face, lacks both the intent and the distinct overt act requirements found crucial to the constitutionality of the Federal Act. The Virginia Act’s exceptions are limited. As a result, the Virginia Act unconstitutionally criminalizes the standard D & E because a doctor performing such a *145 procedure cannot know at the outset whether he will accidentally violate the Act.
D.
It is undisputed that all doctors who set out to perform standard D & E abortions — the most common second trimester method — may accidentally deliver the fetus to an anatomical landmark. The record evidence supporting this fact is not “hypothetical” or “speculative,” e.g., post at 164, 159; it is based on the firsthand experience and knowledge of the witnesses in this case. The record further contradicts the dissent’s contention that the Commonwealth’s experts state that accidental intact delivery “never occurs.” Post at 164. Witnesses for both sides testified that it is impossible to predict the point at which the fetus will disarticulate during a D & E. As a result, the fetus will sometimes emerge to an anatomical landmark, regardless of the doctor’s intent at the outset. Dr. Fitzhugh testified that in his practice a fetus accidentally emerges past an anatomical landmark in a small fraction of his cases each year. The Commonwealth agrees that a fetus sometimes accidentally emerges to an anatomical landmark during a standard D & E, Appellants’ Supplemental Reply Br. 6. The Supreme Court has also accepted this fact as established. Carhart II, 127 S.Ct. at 1632.
A doctor faced with the unintentional delivery of a fetus to an anatomical landmark usually causes fetal demise simply by taking the steps necessary to complete the abortion, specifically, applying traction to the fetus that results in disarticulation or compressing the fetal skull to dislodge it from the cervix. Despite the dissent’s claim, it is not “a very rare event” for the fetal skull to become lodged. Post at 153. As the Supreme Court has stated, “after 16 weeks ... the fetal skull becomes too large to pass through the cervix.” Carhart I, 530 U.S. at 927, 120 S.Ct. 2597; see also Carhart II, 127 S.Ct. at 1621-22 (describing how, “[i]n the usual intact D & E” — when the cervix is dilated more than in a standard D & E — “the fetus’ head lodges in the cervix, and dilation is insufficient to allow it to pass”). Furthermore, there is no “medical uncertainty” in the record about the methods for removing a lodged fetal skull from the cervix. Post at 159 (quoting Carhart II, 127 S.Ct. at 1637) (quotation and alteration omitted). As we have explained, it is undisputed that a doctor will have to collapse the fetal skull in this situation. See supra at 134 & n. 1.
Indeed, Carhart II thoroughly discredits the dissent’s repeated assertion that our concern is based on a “hypothetical” situation. There, the Supreme Court recognized that, in reality, a standard D & E sometimes results in accidental delivery to an anatomical landmark. See Carhart II, 127 S.Ct. at 1632 (“A fetus is only delivered intact in a small fraction of the overall number of D & E abortions.”). According to the Court, the Federal Act is constitutional precisely because it does not criminalize accidental intact D & Es. The Court’s focus on accidental intact D & E not only discredits the dissent’s contention that this event is hypothetical, it also highlights the central importance of avoiding liability for doctors who encounter such an event.[5]
*146 Because the doctor violates the Virginia Act when a standard D & E results in an accidental intact delivery and he must then perform an act causing fetal demise, he subjects himself to the risk of criminal liability at the outset of every standard D & E. The only way for a doctor to avoid this risk is to refrain from performing all standard D & E procedures. As a result, the Virginia Act imposes an undue burden upon a woman’s right to choose a previa-bility second trimester abortion. The Act is therefore unconstitutional.
rv.
Finally, we consider the Commonwealth’s arguments that the plaintiffs cannot mount a facial challenge to the Virginia Act on grounds of overbreadth.
The Commonwealth first contends that we may not consider the constitutionality of the Act because Carhart II forecloses all facial challenges alleging over-breadth in statutes regulating abortion. We disagree. In Carhart II the Court entertained just such an overbreadth challenge. The Court explained that the challenge was based on the Federal Act’s “operation and effect,” and the issue could be resolved by “[a] straightforward reading of the Act’s text.” Id. at 1627. After careful consideration of the terms of the Federal Act, the Court concluded that the Federal Act did not impose an undue burden through overbreadth because it did not “prohibit the vast majority of D & E abortions.” Id. at 1632. Even though the Carhart II plaintiffs failed to demonstrate that the Federal Act was overly broad, the decision confirms that an overbreadth challenge can be mounted against an abortion regulation.
In contrast to its consideration of the overbreadth claim, the Carhart II Court disapproved the use of a facial challenge in the context of the separate objection to the Federal Act for its lack of a health exception. Id. at 1638-39. “In these circumstances,” the Court stated, “the proper means to consider exceptions is by an as-applied challenge.” Id. at 1638. An as-applied challenge
is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used. In an as-applied challenge the nature of the medical risk can be better quantified and balanced than in a facial attack.
Id. at 1638-39. Carhart II thus limited its requirement for an as-applied challenge to this specific context. In sum, Carhart II does not question the established validity of facial challenges to abortion statutes. See Sabri v. United States, 541 U.S. 600, 609-10, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (citing Carhart I, 530 U.S. at 938-46, *147 120 S.Ct. 2597); Casey, 505 U.S. at 895, 112 S.Ct. 2791; see also Northland Family Planning Clinic, Inc. v. Cox, 487 F.3d 323 (6th Cir.2007), cert. denied, — U.S. -, 128 S.Ct. 873, 169 L.Ed.2d 725, 2008 WL 59328 (Jan. 7, 2008) (applying Carhart II to hold a Michigan abortion ban unconstitutional on its face).
The Commonwealth argues further that even if a facial challenge is allowed here, the plaintiffs must satisfy the “no set of circumstances” burden for overbreadth challenges set forth in United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In Salerno, a case challenging a pretrial detention statute, the Court said that a plaintiff mounting a facial attack “must establish that no set of circumstances exists under which the Act would be valid.” Salerno, 481 U.S. at 745, 107 S.Ct. 2095. We are not bound to use the Salerno standard, and our reason is simple: the Supreme Court has not adopted this standard in the abortion context. In Casey, decided after Salerno, the Court struck down an abortion statute after concluding that it would be unconstitutional “in a large fraction of cases in which [the statute] is relevant.” Casey, 505 U.S. at 895, 112 S.Ct. 2791 (opinion of the Court). After Casey the Court in Carhart I held an abortion statute unconstitutional on its face without any mention of Salerno or its standard. Carhart I, 530 U.S. at 938-46, 120 S.Ct. 2597; see also Sabri, 541 U.S. at 609-10, 124 S.Ct. 1941 (citing Carhart I in confirming that over-breadth challenges are allowed in the context of abortion regulation). And, most recently, the Court in Carhart II declined to endorse the “no set of circumstances” standard, stating that the debate about the proper burden need not be resolved. 127 S.Ct. at 1639. The Carhart II Court went on to apply Casey’s standard rather than Salerno’s, holding that the plaintiffs were unable to “demonstrate[ ] that the [Federal] Act would be unconstitutional in a large fraction of relevant cases.” Id. at 1639 (citing Casey, 505 U.S. at 895, 112 S.Ct. 2791) (emphasis added).
Contrary to the dissent’s assertion, this circuit has not squarely confronted the question of Salerno’s applicability to a claim alleging an undue burden on a woman’s access to abortion, the claim at issue in this case. The dissent argues, nevertheless, that our application of the Salerno standard in Greenville Women’s Clinic v. Commissioner, South Carolina Department of Health and Environmental Control, 317 F.3d 357 (4th Cir.2002), is controlling. In that case, however, we did not analyze whether the regulation (an abortion clinic licensing scheme) imposed an undue burden on a woman’s access to abortion. Id. at 361. Instead, we analyzed whether the challenged regulation violated procedural due process under Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Id. at 361-63, 6 S.Ct. 1064. In fact, in an earlier decision, when our court did consider whether the same regulation imposed an undue burden, we noted disagreement about the proper standard for facial challenges asserting undue burden, reserved the question, and held that the regulation survived under any of the standards advanced. Greenville Women’s Clinic v. Bryant, 222 F.3d 157, 164-65 (4th Cir.2000). Our other cases addressing the proper standard for the undue burden analysis likewise declined to decide what standard applied. See Planned Parenthood of the Blue Ridge v. Camblos, 155 F.3d 352, 359 n. 1 (4th Cir.1998) (en banc); see also id. at 381 n. 14 (stating that discussion of Salerno standard in Manning v. Hunt, 119 F.3d 254 (4th Cir.1997), was dicta); Manning, 119 F.3d at 268 n. 4 (noting that the issue of Salerno’s applicability is “not now properly before the Court”).
*148 Prior to Carhart II seven circuits, based on analysis of the relevant Supreme Court cases, had concluded that Salerno does not govern facial challenges to abortion regulations. See Cincinnati Women’s Servs., Inc. v. Taft, 468 F.3d 361, 367-69 (6th Cir.2006) (citing cases). Nothing in Carhart II or in our circuit precedent prevents us from reaching the same conclusion. See Richmond Med. Ctr. for Women, 409 F.3d at 627-28. This conclusion is the correct one, we believe, in light of Carhart II, Carhart I, and Casey, none of which adopt the Salerno standard. Accordingly, we hold that Salerno’s “no set of circumstances” standard does not apply in the context of a facial challenge, like the one here, to a statute regulating a woman’s access to abortion. See Casey, 505 U.S. at 895, 112 S.Ct. 2791.
The Commonwealth argues finally that regardless of the plaintiffs’ burden, the Virginia Act is not subject to a facial challenge because accidental intact D & Es only occur in a small fraction of eases. According to the Commonwealth, the unconstitutional application of the Act in such limited circumstances does not create an undue burden on a woman’s right to choose an abortion. The Commonwealth’s argument misses the mark.
A doctor attempting in good faith to comply with the Virginia Act will accidentally violate the Act in a small fraction of cases. But the doctor never knows prior to embarking on any standard D & E procedure whether a violation will occur. Thus, every time a doctor sets out to perform a standard D & E, he faces the unavoidable risk of criminal prosecution, conviction, and imprisonment under the Virginia Act. In short, the only way that a doctor could avoid criminal liability is to avoid performing D & E abortions altogether. The Act thus effectively prohibits all D & E procedures, which comprise the overwhelming majority of second trimester abortions. As a result, we are compelled to conclude that the Virginia Act imposes an undue burden on a woman’s right to choose an abortion. See Carhart II, 127 S.Ct. at 1627, 1632, 1637; Carhart I, 530 U.S. at 945-46, 120 S.Ct. 2597; Casey, 505 U.S. at 878-79, 112 S.Ct. 2791; Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 75-79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).
V.
In sum, the Virginia Act is susceptible to only one construction, and we cannot avoid the constitutional implications of that construction. See Carhart II, 127 S.Ct. at 1631. As we have demonstrated, the Virginia Act differs from the Federal Act in two key ways. First, the Virginia Act does not require that a doctor intend to perform an intact D & E at the outset of the abortion procedure for a violation to occur; it thus allows criminal liability to be imposed on a doctor who sets out to perform a standard D & E when the fetus accidentally emerges to an anatomical landmark. Second, the Act does not require an overt fatal act distinct from delivery, thereby imposing criminal liability on a doctor performing a standard D & E when the completion of delivery causes fetal demise after a fetus reaches an anatomical landmark. Thus, a doctor performing a standard D & E cannot predict whether he will violate the Act. As a result, the Act on its face effectively prohibits all standard D & Es, imposing an undue burden on a woman’s right to choose an abortion before fetal viability. Because this defect infects the entire Act, partial invalidation is not an option. Any remedy short of declaring the Act invalid would require us to rewrite its very core, and that is a task that must be left to the legislature. See Ayotte v. Planned Par *149 enthood of N. New England, 546 U.S. 320, 328-30, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006).
We therefore affirm the district court’s ruling that declares the Virginia Act unconstitutional on the ground that it imposes an undue burden on a woman’s constitutional right to choose a (previability) second trimester abortion. We likewise affirm the permanent injunction against enforcement of the Act. We recognize, of course, that Virginia may enact a statute that prohibits certain abortion procedures, such as the intact D & E, so long as the statute complies with the limits imposed by the Constitution. Carhart II provides the Commonwealth with further (and important) guidance.

AFFIRMED

. Harlan Giles, M.D., one of the Commonwealth's experts, testified that the appropriate procedure for dislodging a fetal skull during a D & E is to administer terbutaline, nitroglycerin, Fluothane, or halothane. According to Dr. Giles, these medications cause additional cervical dilation, which should allow the fetus to be removed intact. The district court excluded this testimony based in part on Dr. Giles's admitted lack of knowledge about the use of this technique in the D & E procedure. See Richmond Med. Ctr. for Women, 301 F.Supp.2d at 509-12 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). As the district court noted, Dr. Giles stated that he could not recall ever using this technique during a D & E. See id. at 509. In addition, Dr. Giles admitted that he (1) did not know of any doctors who used the technique in D & Es, (2) was not aware of any studies on its safety or efficacy, and (3) was not aware of any medical literature that suggested the use of these drugs to dislodge a fetal skull during a D & E. See id. at 509-10. Dr. Giles also suggested two other methods for dislodging a fetal skull during a D & E: (1) wait a couple of hours for the cervix to relax and make another attempt to remove the fetus intact or (2) compress the skull with forceps. Again, as noted by the district court, he was unable to recall ever having used these two methods during a D & E. See id. (Dr. Giles performs mainly induction abortions in the second trimester, and he has only performed one D & E since 1998.)
Under Federal Rule of Evidence Rule 702 expert testimony must be both relevant and reliable. Daubert, 509 U.S. at 589, 113 S.Ct. 2786. To satisfy these requirements, the testimony must be based on "more than subjective belief or unsupported speculation.” Id. at 590. Furthermore, a proffered expert’s professional qualifications are insufficient to support his testimony; he must also have "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." Kumho Tire Co., 526 U.S. at 156, 119 S.Ct. 1167 (emphasis added) (internal quotation marks omitted). As the district court concluded, although Dr. Giles has credentials and experience as an obstetrician/gynecologist and perinatologist, he does not have specialized experience or knowledge about the appropriate procedures for dislodging a fetal skull during a D & E abortion. See Richmond Med. Ctr. for Women, 301 F.Supp.2d at 509-12. Because the district court reason *135 ably determined that Dr. Giles's testimony on this discrete subject was unsupported and unreliable, id. at 511-12, it did not abuse its discretion in excluding it. See Kumho Tire Co., 526 U.S. at 158, 119 S.Ct 1167. (It is unnecessary for us to decide whether the district court erred in excluding the remainder of Dr. Giles's evidence as well as certain other evidence offered by the Commonwealth. This excluded evidence does not create any issue of material fact that is relevant to our decision today.)

. We understand "outside the body of the mother” to mean beyond the vaginal opening.

. For the purpose of this discussion, we assume that the terms "dismemberment” and "disarticulation” may be used interchangeably.

. The dissent relies on the testimony of Dr. Giles to dispute this point. See post at 153. As we have discussed above, the district court did not abuse its discretion in excluding as unreliable Dr. Giles's opinion regarding the methods for extracting a lodged fetal skull. Supra at 134-35 n. 1.

. The dissent also states that RMCW’s expert, Charles DeProsse, M.D., "suggested” that there was no need to perform an overt act when the fetus passes through the cervix head first. Post at 159. This contention is irrelevant because Dr. Fitzhugh does not argue he would have to commit an overt act in the rare situations in which the fetus is delivered entirely intact. The dissent simply fails to recognize that it is far more common for the fetal skull to become lodged or for the fetus to *146 disarticulate during delivery. See Carhart II, 127 S.Ct. at 1622.
The dissent further cites statements made by the Commonwealth's expert witnesses to dispute the occurrence of accidental intact D & E. Post at 164 n. 2. The dissent, however, focuses on the witnesses’ legal conclusions rather than their testimony about the medical subjects on which they were proffered as experts. For instance, although John W. Seeds, M.D., stated that he could not think of a situation when a doctor would have to violate the Act, he also testified that when the fetal skull becomes lodged during a D & E, there is no reliable method for removing the fetus intact and alive, as the doctor must compress the skull. Similarly, Dr. Giles agreed that "there’s no way for a physician to predict or control” the point at which a fetus disarticu-lates during removal. J.A. 444. In other words, Dr. Giles agreed that a fetus could accidentally emerge intact to an anatomical landmark and that disarticulation could thereafter occur, regardless of the doctor’s intent.